## 2016-1477, -1481

# United States Court of Appeals
# for the Federal Circuit

NORTHPEAK WIRELESS, LLC,

*Plaintiff - Appellant*

*v.*

3COM CORPORATION, HEWLETT-PACKARD COMPANY, D-LINK
SYSTEMS, INC., FUJITSU AMERICA, INC., GATEWAY, INC., ACER
AMERICA CORPORATION, ASUS COMPUTER INTERNATIONAL
CORPORATION, BELKIN INTERNATIONAL, INC., U.S. ROBOTICS
CORPORATION, BUFFALO TECHNOLOGY (USA), INC., BUFFALO
AMERICAS, INC., DELL, INC., SONICWALL, INC., NETGEAR, INC., SMC
NETWORKS, INC., SONY ELECTRONICS, INC., SONY COMPUTER
ENTERTAINMENT AMERICA LLC, TOSHIBA AMERICA INFORMATION
SYSTEMS, INC., TRENDNET SYSTEMS, INC., TRENDWARE
INTERNATIONAL, INC., ZONET USA CORPORATION, VIEWSONIC
CORPORATION, ZYXEL COMMUNICATIONS, INC.,

*Defendants - Appellees*

INTEL CORPORATION,

*Defendant - Appellee.*

*Appeals from the United States District Court for the Northern District
of California in Nos. 3:09-cv-00602-SI and 3:15-cv-05273-SI,
Judge Susan Y. Illston*

## BRIEF FOR APPELLANT

DEREK T. GILLILAND
NIX PATTERSON & ROACH, LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333
dgilliland@nixlawfirm.com

CHRISTIAN JOHN HURT
NIX PATTERSON & ROACH, LLP
5215 N. O'Connor Boulevard, Suite 1900
Irving, TX 75039
(972) 831-1188
christianhurt@nixlawfirm.com

*Counsel for Appellant*

MARCH 14, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NorthPeak Wireless, LLC v. 3Com Corporation

## Nos. 16-1477 & 16-1481

## CERTIFICATE OF INTEREST

Counsel for Appellant, Christian Hurt, certifies the following:

1.  The full name of every party or amicus represented by me is:

NorthPeak Wireless, LLC.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.  The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Kessler Topaz Metlzer & Check, LLP; Eli Greenstein;

Nix Patterson & Roach, LLP; Derek Tod Gilliland; Andrew Joseph Wright (former); Christian J. Hurt; Edward K. Chin (former); Kirk Austin Voss; Robert Winn Cutler; Ross Leonoudakis.

DATED: March 14, 2016.          Respectfully submitted,

_____

CHRISTIAN HURT
*Attorney for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES .................................................1

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE ..............................................................2

STATEMENT OF THE FACTS ............................................................2

    I.    The Technology of the '577 Patent .......................................2

    II.    NorthPeak's Proceedings Against the Defendants and the
         District Court's Claim Construction Opinion......................11

         A.    Register ........................................................12

         B.    [Preamble/Address/Data] Register ...........................13

         C.    Storing/Stored..................................................14

         D.    [Chip Code Generation/Preamble/Address] Means ................14

SUMMARY OF THE ARGUMENT .....................................................17

ARGUMENT ........................................................................18

    I.    Standard of Review........................................................18

    II.    The Term Register Does Not Exclude Regular Memory, Memory
         Buffers, or Random Access Memory................................18

         A.    The Plain Meaning of "Register" Includes Different
             Memory Structures, Not Simply a Series of Flip Flops...........20

         B.    The Claims and Specification Undisputedly Lack Disclaimer

Or Lexicography ................................................................20

C.    The Prosecution History Does Not Disclaim Regular Memory,
       Memory Buffers, or Random Access Memory .......................20

III.   The Claimed Registers Are Not Limited to "Explicit" Registers .......22

A.    NorthPeak Agrees That the Preamble, Address, and
       Data Registers Are Separate Claim Elements .........................23

B.    The Prosecution and Reexamination History
       Does Not Require "Explicit" Registers ...................................24

IV.    The District Court Improperly Limited Storing Data to
       Writing Data—Excluding Data Hardcoded Into Memory ................25

A.    The Plain Meaning of Storing is Not "Writing" .....................26

B.    The Intrinsic Record Does Not Require
       Writing Data to Memory ........................................................26

V    The District Court Improperly Narrowed the Corresponding
       Structure for the Means-Plus-Function Limitations ..........................29

A.    The Specification Expressly Links the Circuit Components
        For Each Means-Plus-Function Limitation ...........................30

B    The "Outputting" Functions Do Not Require
       Additional Circuitry ................................................................38

C.    The Patent Act Requires the Construction of
       Means-Plus-Function Limitations to Include "Equivalents" ...42

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................43

**ADDENDUM**

District Court Opinion, Dated August 28, 2015 ......................................A1

U.S. Patent No. 4,977,577 ................................................................A25

# TABLE OF AUTHORITIES

## Cases

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)...................................................................40

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997)...................................................................31

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,
    616 F.3d 1249 (Fed. Cir. 2010) ..................................................................23

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005)...................................................................42

*Gaus v. Conair Corp.*,
    363 F.3d 1284 (Fed. Cir. 2004)...................................................................23

*GE Lighting Solutions. v. AgiLight, Inc.*,
    750 F.3d 1304.............................................................................................27

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
    783 F.3d 1262 (Fed. Cir. 2015)...................................................................39

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)...............................................................27, 39

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)...................................................................21

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015)...............................................................18, 27

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013).....................................................................42

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991)...................................................................43

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) ....................................................43

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .................................................27

## Statutes & Rules

35 U.S.C. § 112 ..............................................................................30, 42

## STATEMENT OF RELATED CASES

There have been no other appeals in this proceeding from the District Court or any other court.  Counsel for Appellant is not aware of other cases pending in this or any other court that will directly affect or directly be affected by this Court's decision in this appeal.

An appeal by NorthPeak Wireless, LLC ("NorthPeak") from the Patent Trial and Appeal Board ("PTAB") involving U.S. Patent No. 5,987,058, a patent related to the Patent-in-Suit, U.S. Patent No. 4,977,755 ("the '577 Patent"), was docketed in this Court on June 23, 2013.  *In re NorthPeak Wiresless, LLC*, Case No. 13-1475.  The Court granted NorthPeak's unopposed motion to voluntarily dismiss the appeal in October, 2013, prior to any briefing.  Docket No. 16.

## JURISDICTIONAL STATEMENT

This consolidated appeal arises from the District Court's entry of a final judgment in *NorthPeak Wireless, LLC v. 3Com Corp.*, Case No. 3:09-CV-00602-SI (N.D. Cal.) and *NorthPeak Wireless, LLC v. Intel Corp.*, Case No. 3:15-CV-05273-SI (N.D. Cal.).  This Court thus has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

This appeal raises four claim-construction issues in a Patent relating to foundational digital wireless communications technology: (1) the construction of

1

the term "register"; (2) the construction of the terms "[preamble/address/data] register"; (3) the construction term "storing/stored"; and (4) the construction three means-plus-function limitations, "chip code generation means," "preamble means," and "address means."

## STATEMENT OF THE CASE

This appeal challenges the District Court's construction of a number of claim terms in the '577 Patent, Joint Appendix ("J.A.") 8–20, which resulted in judgment of nonfringement based on the parties' stipulation, J.A. 1690–98 (Intel); J.A. 2037–52 (Non-Intel Defendants).

## STATEMENT OF THE FACTS

### I.    The Technology of the '577 Patent

The '577 Patent relates to consumer wireless devices that employ direct-sequence spread-spectrum ("DSSS") modulation techniques.  The Patent describes a wireless alarm system with specific DSSS internal circuitry that has many consumer applications.  The claims, and the bulk of the specification, are directed to the internal circuits of the spread spectrum transmitter and receiver.  Figure 1 of the Patent depicts an exemplary system of spread spectrum transmitters and receivers.



J.A. 1172, '577 Patent, Fig. 1 (redrawing of Fig. 1 on J.A. 26).

The majority of the claim limitations raised on appeal revolve around the circuitry inside the spread spectrum transmitters and receivers. Figure 2 of the Patent depicts an exemplary circuit for a spread spectrum transmitter that includes four exemplary registers: a register that generates a chip code (10); a register that contains the preamble, i.e., data that synchronizes the transmitter and receiver (11); an address register (14); and a data register (18). Each of those registers is highlighted below.



J.A. 1299, '577 Patent, Fig. 2 (highlighted Fig. 2 from J.A. 27).

During operation, the circuit combines the chip code with the information stored in the other three registers, first the preamble, the address, and then the data. That combining acts to "spread" the information over the bandwidth allocated for the system when it is transmitted.

The circuit first combines the chip code in register (10) with the information in the preamble register (11) and transmit the spread information. The preamble is a series of bits that signals to the receiver that it a transmission is about to begin.



J.A. 1186, '577 Patent, Fig. 2 (redrawing of Fig. 2 on J.A. 27).

Next, the transmitter combines the chip code in register (10) with the address data in address register (14) and transmits the spread information to the receiver.



J.A. 1190, '577 Patent, Fig. 2 (redrawing of Fig. 2 on J.A. 27).

Lastly, the transmitter combines the chip code in register (10) with the data in data register (18) and transmits the spread data to the receiver.

5



J.A. 1194, '577 Patent, Fig. 2 (redrawing of Fig. 2 on J.A. 27).

The transmitter depicted in Figure 2 employs an oscillator (2) to generate an RF signal that prepares the data for transmission through antenna (5) into the air, though other components (such as a modulator) could also be used. *See generally* J.A. 36–38, '577 Patent, col. 5 l. 35–col. 9 l. 4.

A spread spectrum receiver generally operates as a mirror of the spread spectrum transmitter. The receiver generates a matching copy of the specific chip code used by the transmitter and, using that matching code, extracts the preamble that was contained in register (11), the address contained in register (14), and the data contained in register (18).

Generally, the receiver first receives a spread signal that contains many chips (a string of 0s and 1s generated using the chip code at the transmitter) and, using a dispreading circuit, recombines those chips to form a single bit. In the

example below, the receiver first receives the spread signal that contains the chips "1010011010" (the purple string to the left of the dispreading circuit).



J.A. 1184.

Using the chip code, the receiver's dispreading circuit then determines that the received series of chips represents a bit with a value of "0" (the purple bit to the right of the dispreading circuit).

One benefit of using such a scheme is that if some of the chips are corrupted during transmission—by noise, for example—the receiver can still accurately reproduce transmitted bit value. That is in large part because a single bit is represented by multiple chips, and, after receiving a certain number of chips, the receiver can predict if the transmitted bit was a "0" or a "1" (similar to a person guessing a song title and artist after hearing only a certain number of notes).

In addition to the transmitter discussed above, the patent discloses a complex matching receiver design. *See generally*, J.A. 28–29, '577 Patent, Figs. 3A and 3B; J.A. 38–41, '577 Patent, col. 9 l. 5–col. 16 l. 34.

There are three independent claims and one dependent claim at issue in this case. Specifically, NorthPeak has alleged infringement of claims 9, 12, 13, and 14. Claims 9 and 12 are apparatus claims and claims 13 and 14 are method claims.

Claim 9 recites the following:

> An apparatus coupled to modulation means having a modulation input for modulating an RF signal with spread spectrum for reducing interference, for controlling said spread spectrum transmitter, said apparatus comprising:
>
> *chip-code-generation means* coupled to the modulation input of said modulation means for *storing* a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to the modulation input of said modulation means;
>
> *preamble means* coupled to the modulation input of said modulation means for storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulation means;
>
> *address means* coupled to the modulation input of said modulation means for *storing* a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means; and
>
> wherein said preamble means, and said address means, sequentially output the preamble, and device address, to the modulation input and the spread spectrum chip code from said chip code generating means spread the

8

> preamble, and device address at the modulation input to generate the spread spectrum of an RF signal, and wherein the preamble provides acquisition for spread spectrum snychronization of the spread spectrum of the RF signal, for demodulating the spread spectrum of the RF signal.

J.A. 43, '577 Patent, claim 9 (emphases added). Claim 12 further includes a data register as well as an error detection means, which is not at issue in this appeal. *Id.*, '577 Patent, claim 12. Claims 13 and 14 are drawn to method claims for controlling a spread spectrum transmitter.

Claim 13 recites the following:

> A method using processor means for controlling a spread spectrum transmitter having an oscillator with a modulation input and an RF power amplifier with a keying input, comprising the steps, performed by said processor means, of:

> *storing* a spread spectrum chip code in *chip code generation means* coupled to the modulation input of said oscillator;

> outputting, during a transmitting interval, a preamble from a *preamble register* to the modulation input of said oscillator;

> outputting, during a transmitting interval, a device address from an *address register* coupled to the modulation input of said oscillator;

> outputting simultaneously, during the transmitting interval, data from a *data register* and the spread spectrum chip code *stored* in said *chip code generation means*, to the modulation input of said oscillator, thereby

generating a spread spectrum signal including the data; and

generating an enabling signal and a keying signal during the transmitting interval, from a timing circuit coupled to the enable input of said oscillator and to the keying input of said RF power amplifier, for activating said oscillator and said RF power amplifier.

J.A. 43, '577 Patent, claim 13 (emphases added).   Claim 14 recites a similar method:

A method using processor means for controlling a spread spectrum transmitter having an oscillator with a modulation input, comprising the steps, performed by said processor means, of:

outputting, during a transmitting interval, a preamble from a *preamble register* to the modulation input of said oscillator;

outputting, during a transmitting interval, a device address from an *address register* coupled to the modulation input of said oscillator; and

outputting simultaneously, during the transmitting interval, data from a data register and a spread spectrum chip code *stored* in *chip code generation means*, to the modulation input of said oscillator, thereby generating a spread spectrum signal including the data.

J.A. 43, '577 Patent, claim 14 (emphases added).

The '577 Patent was filed in the late 1980s, years before the proliferation of consumer wireless devices (such as wireless routers and adapters).  J.A. 25, '577 Patent, at (22).  The patented technology was initially developed by Axxon

10

Corporation. *Id.*, '577 Patent, at (73). Axxon made and offered for sale products that incorporated the patented technology, including dual board transceivers. *See* J.A. 1174. The circuit board from an example Axxon product is depicted below.



J.A. 1175.

NorthPeak is the successor-in-interest to Axxon. After determining that the Defendants' 802.11(b)-compliant devices infringed various claims of the '577 Patent, NorthPeak the infringement claims that are the subject of this appeal.

## II.    NorthPeak's Proceedings Against the Defendants and the District Court's Claim Construction Opinion

NorthPeak initially filed suit against the Non-Intel Defendants in late 2008. J.A. 1. In early 2009, Intel moved to intervene in the action, and the Court granted Intel's motion. *Id.* Later that year, Intel initiated *ex parte* reexamination of the '577 Patent (and a related patent), *id.*, and the Court stayed this action pending completion of those proceedings, J.A. 130 (Docket No. 426). The U.S. Patent &

Trademark Office ("Patent Office") confirmed the patentability of the challenged claims of the '577 Patent in 2011.  J.A. 1.  Intel then initiated a second reexamination in 2013, and the Patent Office again confirmed the patentability of the '577 Patent in 2014.  *Id.*  The District Court set the case on a schedule in early 2015, after the case had been stayed for the better part of five years.  J.A. 142 (Docket No. 541).

The District Court then construed the claims.  Of the claim terms, the construction of four terms is at-issue in this appeal: "register," "[preamble/address/data] register," "storing/stored," and "[chip code generation/preamble/address] means."

### A.    Register

The Court construed the term "register" as "a small, named region of high speed memory located within a microprocessor or any electronic device capable of storing binary data.  A register is usually large enough to hold only a few bytes of information and is referenced in programs by a name, rather than an address."  J.A. 10.  The Court based its construction on a dictionary definition presented in the reexamination proceedings.  *Id.*  The Court further concluded that NorthPeak had disclaimed regular memory, random access memory, and memory buffers during the reexamination proceedings: "NorthPeak made numerous statements to the PTO which unambiguously reject the notion that a 'register' may be defined to include

regular memory.  Its statements also reflect the understanding that one skilled in the art would interpret registers to be distinct from regular memory, random access memory, or memory buffers." *Id.*  The Court did not address the plain-and-ordinary meaning of the term or the express construction proposed by NorthPeak in the reexamination proceedings—"a designated or specific region of memory in a computer processor." J.A. 338.

### B.    [Preamble/Address/Data] Register

The District Court construed this term as "an explicit register that stores and outputs [preamble/address/data] information." J.A. 11.  The Court concluded that "NorthPeak highlighted this feature of the invention to distinguish it from art throughout prosecution." *Id.*

During reexamination, NorthPeak stated that a prior art reference "fail[ed] to disclose the explicit register structure of [un-asserted] claim 2, which recites separate claim elements for a 'preamble register,' an 'address register,' and a 'data register.'" J.A. 356.  NorthPeak also argued that Kahn did not invalidate the pending claims because it failed to disclose a preamble register. J.A. 355.  During prosecution, the applicants stated that "[t]he difference between Eden et al. and the claimed invention, as stated by the examiner, is the use of explicit registers to store the preamble, address, chip code and data prior to modulation." J.A. 757 (emphasis added).  The applicants distinguished Eden et al. on grounds that the

reference "does not describe a spread spectrum system," and not on the basis of "the use of explicit registers." J.A. 758–59.

### C.    Storing/Stored

The District Court construed this term as "writing/written." J.A. 12. It reached this conclusion because it found that the Patent did not disclose "non-memory components" to store the chip code. *Id.* It did not address the plain meaning of "storing" or "stored." *See id.*

### D.    [Chip Code Generation/Preamble/Address] Means

The parties' disputes for these terms center on the corresponding structure. For each of these means-plus-function limitations, the Court excluded the phrase "and equivalents" from the construction. J.A. 12–13 n.6. The Court reached this conclusion even though 35 U.S.C. § 112, ¶ 6 recites that means-plus-function limitations "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

Second, for each means-plus-function term, the Court limited the corresponding structure. Each means-plus-function limitation require "outputting . . . as a modulating voltage to the modulation input of a modulation means or oscillator." *See* J.A. 43, '577 Patent, claim 9. To perform that function, the Court included as corresponding structure the components that connect the various registers that embody each means to the oscillator—resistor R7 for the recited

14

"chip code generation means" (embodied as register (10)); resistor R6 for the "preamble means" (embodied as preamble register (11)); and resistor R6 for the "address means" terms.  J.A. 14–15, 17, 18.



J.A. 27, '577 Patent, Fig. 2 (certain components erased).

The Court also excluded a number of structures as being corresponding structure for the "chip code generation means" limitation, including a shift register with exclusive ORed feedback taps, or the chip code generator in Figure 3B.  J.A. 13–14.

The Court reached these conclusions despite the '577 Patent specification defining the corresponding structure that performs the recited functions for each of these claims terms—and it does not include the additional, limiting circuitry found by the District Court:

15

- Chip Code Generation Means.  "The chip-code-generation means can be embodied as a recirculating register . . . .  The recirculating register is coupled to the modulation input of the oscillator for storing the spread spectrum code.  The recirculating register also outputs the spread spectrum chip code as a modulating voltage to the modulation input of the oscillator."  J.A. 34, '577 Patent, col. 2 ll. 9–18.  "The chip-code-generation means may be embodied as a shift register with exclusive ORed feedback taps."  J.A. 36, '577 Patent, col. 5 ll. 40–42.  "FIG. 3B shows a chip code generator."  J.A. 38, '577 Patent, col. 9 ll. 20–21.

- Preamble Means.  "[T]he preamble means can be embodied as a preamble register . . . .  The preamble register is coupled to the modulation input of the voltage controlled oscillator.  The preamble register stores a preamble, and outputs, during a transmitting interval, the preamble as a modulating voltage to the modulation input of the voltage controlled oscillator."  J.A. 34, '577 Patent, col. 2 ll. 9–22.

- Address Means.  "[T]he address means can be embodied as an address register. . . .  The address register is coupled to the modulation input of the voltage controlled oscillator through the preamble register. The address register stores a device address and a type code, and outputs, during a transmitting interval, the device address and the type code as a modulating voltage to the modulation input of the voltage controlled oscillator."  J.A. 34, '577 Patent, col. 2 ll. 9–33.

* * * * *

Due to the Court's construction, NorthPeak and the Defendants entered into a stipulation of noninfringement to posture this case for appeal.  J.A. 1690–98 (Intel); J.A. 2037–53 (Non-Intel Defendants).  The District Court then entered a final judgment. J.A. 2064–65 (Non-Intel Defendants); J.A. 2069–70 (Intel). NorthPeak timely appealed, and this Court consolidated the two appeals.  Order

Consolidating Appeals (Docket No. 2), Case No. 16-1477.    This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## SUMMARY OF THE ARGUMENT

The District Court erred when it limited the '577 Patent to one embodiment disclosed in the specification—Figure 2.  It did so even though it did not find any statements in the specification that limited or defined the disputed terms; it did not find any "present invention"-type language; and it did not find any statements that distinguish the prior art.  There are none.  And the claim language portions of the specification support a broader view of the claims.  That record shows that the District Court wrongly construed the terms "register," "[preamble/address/data] register," "storing/stored," and the means-plus-function limitations.

Instead of relying on the plain meaning of those terms, the District Court limited the claims largely based on the prosecution and reexamination history of the '577 Patent—tertiary evidence under *Phillips* that requires clear and unmistakable disavowal.  The record, however, lacks that clear evidence.  Despite NorthPeak proposing the exact same construction of "register" in the reexamination proceedings that it proposes in this case, the District Court found that NorthPeak had disclaimed the significant coverage its proposed construction provided.  Similarly, the District Court put the wrong spin on the prosecution history to limit the register terms to "explicit" registers.  For these reasons, and the

17

ones recited below, NorthPeak respectfully requests that this Court reverse the District Court's claim construction, reverse its judgment of noninfringement, and remand this case for further proceedings.

## ARGUMENT

### I.     Standard of Review

The Claim Construction Opinion relied only on intrinsic evidence—the claims and the embodiments in the specification. J.A. 8–20. The District Court did not rely upon extrinsic evidence on the any of the limitations raised on appeal. *See id.* "Because the only evidence at issue on appeal and presented to the district court in this claim construction was intrinsic," this Court's "review of the constructions is de novo." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1023 (Fed. Cir. 2015).

### II.     The Term Register Does Not Exclude Regular Memory, Memory Buffers, or Random Access Memory

| Register | |
|---|---|
| **NorthPeak's Proposed Construction** | **District Court's Construction** |
| "a designated or specific region of memory in a computer processor" | "a small, named region of high speed memory located within a microprocessor or any electronic device capable of storing binary data. A register is usually large enough to hold only a few bytes of information and is referenced in programs by a name, rather than an address." J.A. 10. |

18

| Register | |
|---|---|
| **NorthPeak's Proposed Construction** | **District Court's Construction** |
| | "NorthPeak made numerous statements to the PTO which unambiguously reject the notion that a 'register' may be defined to include regular memory. Its statements also reflect the understanding that one skilled in the art would interpret registers to be distinct from regular memory, random access memory, or memory buffers."  J.A. 10. |

The term "register" appears in each asserted claim, either directly (claims 12, 13, and 14) or indirectly as corresponding structure for various means-plus-function limitations (claim 9).  The District Court erred when it limited the term "register" to exclude certain types of memory structures.  It erred when it declined to adopt NorthPeak's proposed construction in this case—NorthPeak proposed that exact construction during the reexaminations of the '577 Patent.  That construction comports with how skilled artisans understand the term register—it is agnostic to the type of memory structures that embody a register, whether flip-flops, random access memory ("RAM"), or other structures.  Nothing in the intrinsic record warrants a different result.  For these reasons, NorthPeak respectfully requests that the Court reverse the District Court's claim construction of the term "register."

**A.    The Plain Meaning of "Register" Includes Different Memory Structures, Not Simply a Series of Flip Flops**

The District Court improperly imported a negative limitation into the claims—excluding random RAM, regular memory, and memory buffers.  The plain-and-ordinary meaning of the term register, however, does not limit the type of memory that embodies a register: a register could be embodied in flip-flops, RAM, memory buffers, read-only memory ("ROM"), or other structures.  Indeed, during the reexamination of the '577 Patent, NorthPeak proposed the same construction it proposes here, one that is not exclusionary or defined by how the register is constructed: "a designated or specific region of memory in a computer processor."  J.A. 338.

**B.    The Claims and Specification Undisputedly Lack Disclaimer or Lexicography**

It is undisputed that the claims and specification contain any disclaimer or lexicography.  The District Court did not find any, and there is none.  At most, an embodiment of the claims—Figure 2—utilizes flip-flop-based registers.  *See* J.A. 27, Fig. 2.  That fact is, however, an insufficient basis to limit the claims.

**C.    The Prosecution History Does Not Disclaim Regular Memory, Memory Buffers, or Random Access Memory**

The District Court's construction of the term, rather than adopting its plain meaning, hinged on reading-between-the-lines of statements made during the

reexaminations of the '577 Patent. None of those statements, however, rise to the level of clear-and-unmistakable disclaimer required to limit the claims. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). Again, NorthPeak proposed the exact construction of "register" that it proposes here. J.A. 338.

The District Court focused on NorthPeak's statements in connection with two references, Dickson and Kahn to conclude that NorthPeak disclaimed different types of memory structures. That was incorrect. With regard to these references, NorthPeak did not distinguish them on the grounds that the memory structures they employed could not be considered "registers." Instead, those references either failed to disclose a register at all or failed to disclose storing the relevant data in a register. *See generally* J.A. 1304–18.

With regard to the Dickson reference, NorthPeak argued that the reference failed to disclose a "preamble register" because it was not shown in the figures of Dickson, which only disclosed a "data register" and an "address register." *See* J.A. 1306. Similarly, Northpeak argued that the identified "address register" in Dickson stored the wrong information—the address of a packet buffer, not a device address or a preamble as the claims delineate. *See* J.A. 1305, 1307, 1308. NorthPeak's statements did not disclaim any type of register.

The District Court's analysis of NorthPeak's statements relating to the Kahn reference also misses the mark. NorthPeak addressed Kahn on grounds that it was improper to combine the two disclosures of Kahn in an anticipation analysis, *see* J.A. 354–55, that the reference failed to disclose a preamble register, J.A. 355, and that the memory structures in which Kahn stored data were not designated as registers, *see* J.A. 356.

In total, the prosecution history does not compel a finding of disclaimer, especially when NorthPeak proposed the exact construction during prosecution that it urged—and the District Court rejected—in this case. NorthPeak respectfully requests that this Court reverse the District Court's construction of the term "register" and enter NorthPeak's proposed construction.

### III.    The Claimed Registers Are Not Limited to "Explicit" Registers

| [Preamble/Address/Data] Register | |
|---|---|
| **NorthPeak's Proposed Construction** | **District Court's Construction** |
| This claim term should be afforded its plain and ordinary meaning and does not require construction. | "an explicit register that stores and outputs [preamble/address/data] information" J.A. 11. |

Like the term "register," "[preamble/address/data] register" terms appear in each asserted claim, either directly (claims 12, 13, and 14) or indirectly as corresponding structure for various means-plus-function limitations (claim 9). For this term, the Court improperly limited the terms to an "explicit" register. Nothing

in the plain claim language or the specification require that result—the term "explicit register" does not appear in the Patent.  Nor was there clear-and-unmistakable disclaimer in the prosecution history.  Accordingly, the District Court improperly limited the claims and its construction should be reversed.

## A.   NorthPeak Agrees That the Preamble, Address, and Data Registers Are Separate Claim Elements

The claims simply recite three registers as separate claim elements, a preamble register, an address register, and a data register.  Generally, "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."  *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)).

NorthPeak agrees that the claimed registers must be separate elements, *i.e.*, separate registers.  Each register element must be present in an accused device for purposes of infringement or in a prior art reference for purposes of invalidity.  But that rule does not require the registers to be "explicit" registers, whatever that term means.  And that is especially true given that the claims and specification do not use the term "explicit" registers.

## B.    The Prosecution and Reexamination History Do Not Require "Explicit" Registers

The District Court's contrary construction flows from the prosecution and reexamination history of the '577 Patent.  That history, however, does not compel a construction of the register terms to include "explicit" registers.

The District Court relied on two statements to impose an "explicit register" requirement.  During reexamination, NorthPeak stated that a prior art reference "fail[ed] to disclose the ***explicit register structure*** of [un-asserted] claim 2, which recites ***separate claim elements for a 'preamble register,' an 'address register,' and a 'data register.'***"  J.A. 356 (emphases added).  That statement, however, simply repeats what the claims already require—separate register elements (that is the "explicit register structure" NorthPeak referred to).  Indeed, NorthPeak argued that Kahn did not invalidate the pending claims because it failed to disclose a preamble register.  J.A. 355.

Likewise, the prosecution history the District Court relied upon does not require an additional gloss that the registers are "explicit" registers.  During prosecution, the applicants stated that "[t]he difference between <u>Eden et al.</u> and the claimed invention, ***as stated by the examiner***, is the use of explicit registers to store the preamble, address, chip code and data prior to modulation."  J.A. 757 (emphasis added).  That is not disclaimer by the applicants—it is their recitation of the Examiner's position.  Indeed, the applicants distinguished <u>Eden et al.</u> on

24

grounds that the reference "does not describe a spread spectrum system," and not on the basis of "the use of explicit registers." J.A. 758–59. That portion of the file history does not rise to a definitional statement or disclaimer.

* * * * *

At bottom, nothing in the intrinsic record supports the District Court's construction. The claims already recite separate claim elements—a preamble register, an address register, and a data register—and nothing in the claim requires "explicit registers." Nor does any teaching in the specification. The prosecution and reexamination history, at best, is murky and does not rise to clear disclaimer. Ultimately, there is no reason to apply an additional gloss on the claims. NorthPeak respectfully requests that this Court reverse the District Court's Construction of the "[preamble/address/data] register" terms and enter NorthPeak's proposed construction above.

### IV. The District Court Improperly Limited Storing Data to Writing Data—Excluding Data Hardcoded Into Memory

| "Storing/Stored" | |
|---|---|
| **NorthPeak's Proposed Construction** | **District Court's Construction** |
| This claim term should be afforded its plain and ordinary meaning and does not require construction. | "writing/written" J.A. 12. |

The term "storing/stored" is in every asserted claim. The District Court erred when it limited the term—which simply denotes that data resides in

memory—to requiring the data be written to memory.  J.A. 11–12.  In so doing, the Court excluded data that are hardcoded in memory structures (and stored therein).  The Court reached that result even though it did not conclude that the plain and ordinary meaning limited "storing" to "writing."  *See id.*  And it reached that result even though it did not find—and there is none—any statements in the intrinsic record that define "storing" as "writing" or exclude memory elements that contain hardcoded data.  *Id.*  That holding was error, for the reasons below.

## A.    The Plain Meaning of Storing is Not "Writing"

The plain meaning of storing data in memory encompasses data that is resident in a memory, regardless of how the memory obtained the data—whether by loading, writing, or hardcoding the data into the memory.  Nothing in the plain and ordinary meaning of the term limits "storing" to just a one way a memory can obtain the stored data, namely writing it into memory.  Indeed, the Court did not conclude that the plain language supported its construction.

## B.    The Intrinsic Record Does Not Require Writing Data to Memory

Nothing in the specification limits "storing" to only one way of obtaining data to be stored—"writing."  Given the plain language of the claims, the District Court's construction can only be upheld if (1) the patentee acted as a lexicographer to define the "storing" terms; or (2) the patentee disavowed the full claim scope in

the specification or prosecution history. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "The standards for finding lexicography and disavowal are 'exacting.'" *Pacing Techs.* 778 F.3d at 1024 (quoting *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)). Notably, the District Court did not find lexicography or disavowal. And the intrinsic evidence here does not meet that exacting standard.

It is true that the specification, in an embodiment, discloses that the chip code, preamble, and address registers (depicted as a series of flip-flop circuits) "are loaded" with data during installation. J.A. 37, '577 Patent, col. 7 ll. 20–39. Similarly, the embodiment discloses that the data register stores data that it receives from the data input while in operation. J.A. 36, '577 Patent, col. 6 ll. 54–58.

But that disclosure does not disclaim the storing of data by hardcoding it into a memory element, and the District Court did not find disclaimer. And this Court has repeatedly held that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Solutions*, 750 F.3d at 1309 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). It is undisputed that the specification rises to the level—there are no

27

definitional statements, statements distinguishing the prior art, and no "present invention" language relating to the "storing/stored" limitation.

Indeed, the District Court recognized that the disclosure of "loading" the registers was a distinct concept from the claimed "storing/stored" limitations. J.A. 15. The Court, when addressing the construction of the means-plus-function limitations, rejected the Defendants' assertiion that the "storing" function required the circuitry that "loads" each register. *Id.* The Court concluded that the specification "ma[de] clear that the programming circuitry does not play any part in the storage process, but rather *loads* the chip code, which is subsequently stored in the recirculating register." *Id.* (emphasis in original).

But rather than apply that reasoning to the "storing/stored" terms, the Court limited them to "writing/written" because, according to the Court, the Patent did not disclose storing data in a non-memory component. J.A. 12. That is of no consequence. There is nothing inherent about a memory element that requires it to be written in order to store data (as opposed to being hardcoded during manufacture). Those skilled in the art have long been aware of hardcoded memory elements that may embody a register, such as a ROM. Nothing in the Patent disclaims those elements or contains a clear indication that the Patent is limited to memories that store data by writing it to memory, such as RAM.

Accordingly, the District Court erred when it construed "storing/stored" as "writing/written." NorthPeak respectfully requests that this Court reverse the District Court's construction and enter NorthPeak's construction of "storing/stored" recited above.

### V.    The District Court Improperly Narrowed the Corresponding Structure for the Means-Plus-Function Limitations

| "Chip Code Generation Means," "Preamble Means," and "Address Means" | |
| --- | --- |
| **NorthPeak's Proposed Construction** | **District Court's Construction** |
| **Corresponding Structure** | **Corresponding Structure** |
| *Chip Code Generation Means*: a recirculating shift register, a shift register with exclusive ORed feedback taps, or the circuit of Fig. 3B, and equivalents | *Chip Code Generation Means*: a recirculating register and second resistor R7.  J.A. 15. |
| *Preamble Means*: a preamble register, and equivalents | *Preamble Means*: a preamble register and resistor R6.  J.A. 17. |
| *Address Means*: an address register, and equivalents | *Address Means*: an address register coupled through a preamble register and resistor R6.  J.A. 18. |

The District Court committed three principal errors when construing these terms. First, the Court disregarded the teaching of the specification that ***expressly links*** the corresponding structure for each limitation—three different chip code generation circuits for the "chip code generation means," a preamble register for the "preamble means," and an address register for the "address means."

Second the Court included, as part of the "outputting" function, circuitry that does not actually output the data—it merely enables the register to output the data—and is not recited in the specification as performing the "outputting" functions. Those structures include resistor R6 (the preamble means and address means), resistor R7 (the chip code generation means), and the preamble register (the address means).

Lastly, the Court erred when it excluded "and equivalents" from the construction of the mean-plus-function terms. Section 112 ¶ 6 requires that a means-plus-function limitation "**shall be construed to cover** the corresponding structure . . . described in the specification **and equivalents thereof**." 35 U.S.C. § 112, ¶ 6 (emphases added). For these reasons, as detailed further below, NorthPeak respectfully requests that this Court overrule the District Court's construction of these terms and enter NorthPeak's constructions above.

### A.    The Specification Expressly Links the Circuit Components For Each Means-Plus-Function Limitation

The specification expressly recites the corresponding structure for each means-plus-function limitation above. And it is not the limited structure recited by the District Court.

1.    **The Specification Discloses Three Types of Chip Code Generation Circuits That Store and Output the Chip Code**

The specification three types of chip code generation circuits.  It discloses a recirculating shift register as corresponding structure, which is undisputed.  J.A. 34, '577 Patent, col. 2 ll. 9–10 ("The chip-code-generation means can be embodied as a recirculating register.").  It also discloses two additional chip code generation circuits: a shift register with exclusive ORed feedback taps and the detail chip code generator depicted in Figure 3B.  J.A. 36, '577 Patent, col. 5 ll. 40–42 ("The chip-code-generation means may be embodied as a shift register with exclusive ORed feedback taps."); J.A. 38, '577 Patent, col. 9 ll. 20–21 ("FIG. 3B shows a chip code generator . . . .").  Both disclosures suffice as corresponding structure.  *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (explaining that a structure disclosed in the specification qualifies as a corresponding structure if the specification or the prosecution history "clearly links or associates that structure to the function recited in the claim.").

The District Court excluded these structures because it concluded that (1) "[n]othing in the specification links a shift register with ORed feedback taps to the function of storing and outputting a spread spectrum chip code" and (2) the chip code generator circuit in Figure 3B "relates to receivers—not the transmitters that are covered by the claims at issue—and describes an entirely unrelated function."

J.A. 13–14. Both conclusions were incorrect.

First, the shift register with ORed feedback taps is disclosed in connection with Figure 2B as something that can be interchanged with the recirculating register (10) in that embodiment. J.A. 36, '577 Patent, col. 5 ll. 37–42. And it is undisputed that the recirculating register (10) in the circuit shown in Figure 2 is performs the recited storing and outputting functions.



J.A. 1339, '577 Patent, Fig. 2 (highlighted Fig. 2 from J.A. 27).

The specification explains that, as part of circuit described in Figure 2, the shift register with exclusive ORed feedback taps can replace recirculating register (10) and store a chip code and output that chip code to an oscillator (labeled 2):

> Referring to FIG. 2, a preferred embodiment of the transmitter of the instant invention is shown ***including chip-code-generation means***. . . . The chip code-generation-means may be embodied as a recirculating register 10. . . . ***The chip-code-generation means may***

> ***be embodied as a shift register with exclusive ORed feedback taps***.

J.A. 36, '577 Patent, col. 5 ll. 33–42 (emphasis added).  There is no indication in the Patent that a shift register with exclusive ORed feedback taps cannot operate in place of the recirculating register in Figure 2.  To the contrary, the disclosure of the shift register in a paragraph describing the chip code generation means in Figure 2 strongly suggests that the shift register can perform the storing and outputting functions disclosed in the Figure 2 circuit.

The District Court was likewise incorrect when it concluded that the chip code generator in Figure 3B was not corresponding structure for the "chip code generation means" limitation.  For starters, the circuit in Figure 3B shares the same name as the limitation at-issue—a chip code generator—which strongly suggests that it is corresponding structure.  Nothing in the specification points in the other direction.

Instead, the specification further confirms that the chip code generator circuit is a chip code generation means.  The circuit in Figure 3B is capable of performing the recited "storing" and "outputting" functions.  The Figure discloses that RAM (labeled 146) within the circuit stores a chip code and outputs the chip code to a flip-flop circuit (labeled 160), which also stores the chip code and then outputs it.  *See* J.A. 38–39, '577 Patent, col. 10 l. 63–col. 11 l. 1 ("[T]he apparatus includes memory means for storing chip words, which may be embodied as

random access memory 146.").



J.A. 29, '577 Patent, Fig. 3B (certain components erased).

Thus, contrary to the District Court's finding, Figure 3B clearly links the circuit to storing a chip code (in RAM or in the flip flop) and subsequently outputting the chip code. It is true that Figure 3B is disclosed in the receiver-portion of the specification. But the circuit serves the purpose—generating a chip code. And the same chip code has to be used for both the transmitter and receiver portions of the system.

It is also true that Figure 3B does not depict a wire that connects an outputted chip code to the input of an oscillator. But those of skill in the art, reading the disclosure associated with Figure 2, would understand that the recirculating register (one chip code generation means) could be replaced by other similar components described in the Patent, such as a shift register with ORed feedback taps and the chip code generator in Figure 3B.

For the reasons above, the District Court erred when it did not include as corresponding structures the two alternative chip code generation circuits disclosed

in the Patent.

### 2.    The Specification Discloses That a Chip Code Structures Alone Can Perform the Recited Functions

The District Court also erred when it required, as part of the corresponding structure, resistor R7.  The specification teaches that R7 is not required to store or output a preamble, as the passages cited above show.  But the specification is even more clear.  It specifically teaches that the chip code generation circuitry—without additional components—is sufficient to output the preamble as a modulation voltage to a modulation input:

> [T]he chip-code-generation means can be embodied as a recirculating register. . . .  The recirculating register is coupled to the modulation input of the oscillator for storing the spread spectrum code. ***The recirculating register also outputs the spread spectrum chip code as a modulating voltage to the modulation input of the oscillator***.

J.A. 34, '577 Patent, col. 2 ll. 9–18 (emphasis added).  The District Court did not address this passage in the specification.    Instead, it conclude that "the specification ever states that the recirculating register along is capable of voltage modulation."  J.A. 14.  But the recited function is not "modeling a voltage"—it is "***outputting*** the spread spectrum chip code as a modulating voltage to the modulation input of said modulation means or oscillator."   J.A. 15.   And the specification teaches that the recirculating register—without additional circuit

components—performs that function. Indeed, the specification teaches that the voltage upon output of the recirculating register is already modulated. J.A. 34, '577 Patent, col. 2 ll. 9–18. Thus, the Court erred when it included R7 as corresponding structure for the "chip code generation means" limitation.

### 3. The Specification Discloses That a Preamble Register Alone Can Perform the Recited Functions

For the similar reasons, the District Court erred when it concluded that the corresponding structure of the "preamble means" included resistor R6. J.A. 17. The specification expressly teaches that the preamble register—by itself and without any additional circuitry—is adequate to perform the recited storing and outputting functions:

> [T]he preamble means can be embodied as a preamble register . . . . The preamble register is coupled to the modulation input of the voltage controlled oscillator. The **preamble register stores a preamble, and outputs, during a transmitting interval, the preamble as a modulating voltage to the modulation input of the voltage controlled oscillator**.

J.A. 34, '577 Patent, col. 2 ll. 9–23 (emphasis added); *see also* J.A. 1368 (slide depicting NorthPeak's statement during reexamination that "[t]he corresponding structure [of the preamble means] is a preamble register"). The District Court disregarded this disclosure because the Court found that it "makes no mention of 'storing' or 'outputting as a modulating voltage'" and therefore failed to clearly

link the preamble register to those functions. As shown by the portion of the specification above, the District Court's finding is plainly incorrect and its claim construction was in error.

### 4. The Specification Discloses That an Address Register Alone Can Perform the Recited Functions

Likewise, the District Court erred when it concluded that the corresponding structure of the "address means" included resistor R6 and a preamble register. J.A. 18. Again, the specification expressly that the address register—by itself and without any additional circuitry—is adequate to perform the recited storing an outputting functions:

> [T]he address means can be embodied as an address register . . . . The ***address register stores a device address and a type code, and outputs, during a transmitting interval, the device address and the type code as a modulating voltage to the modulation input of the voltage controlled oscillator***.

J.A. 34, '577 Patent, col. 2 ll. 9–33 (emphasis added); *see also* J.A. 1380 (slide depicting NorthPeak's statement during reexamination that "[t]he corresponding structure [of the preamble means] is an address register"). The District Court's contrary reading of the specification and its associated claim construction was in error.

## B. Performing the "Outputting" Functions Does Not Require Additional Circuitry

The specification does not require any additional circuitry to perform the "outputting" functions of the above means-plus-function limitations.  It does not require R6 or R7.  And, for the address means limitation, it does not require a coupling through a preamble register.  The specification makes clear that those components are not required to perform the outputting function for each limitation:

- Chip Code Generation Means.  "The chip-code-generation means can be embodied as a recirculating register . . . .  The recirculating register is coupled to the modulation input of the oscillator for storing the spread spectrum code.  *The recirculating register also outputs the spread spectrum chip code as a modulating voltage to the modulation input of the oscillator.*"  J.A. 34, '577 Patent, col. 2 ll. 9– 18 (emphasis added).  "The chip-code-generation means may be embodied as a shift register with exclusive ORed feedback taps."  J.A. 36, '577 Patent, col. 5 ll. 40–42.  "FIG. 3B shows a chip code generator."  J.A. 38, '577 Patent, col. 9 ll. 20–21.

- Preamble Means.  "[T]he preamble means can be embodied as a preamble register . . . .  The preamble register is coupled to the modulation input of the voltage controlled oscillator.  *The preamble register* stores a preamble, and *outputs, during a transmitting interval, the preamble as a modulating voltage to the modulation input of the voltage controlled oscillator.*"  J.A. 34, '577 Patent, col. 2 ll. 9–22 (emphases added).

- Address Means.  "[T]he address means can be embodied as an address register. . . .  The address register is coupled to the modulation input of the voltage controlled oscillator through the preamble register. *The address register* stores a device address and a type code, and *outputs, during a transmitting interval, the device address and the type code as a modulating voltage to the modulation input of the voltage controlled oscillator.*"  J.A. 34, '577 Patent, col. 2 ll. 9–33 (emphases added).

38

The District Court did not rely on those disclosures, which broadly describe the claimed invention and clearly link each register as performing the outputting functions.  The Court instead solely relied upon the disclosure the example transmitter in Figure 2.  J.A. 14, 17, 18.  The Court concluded that Figure 2 showed that those additional components—R6, R7, and a coupled preamble register—were required to perform the "outputting" functions of the means-plus-function limitations.  *Id.*

That was error for two reasons.  The Court first improperly limited the claims to a single embodiment, even though the specification contained a broader disclosure of corresponding structure that lacked the limitations the Court found in the Figure 2 embodiment.  *See Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015) (reciting that this Court has "expressly rejected the contention that . . . the claims of the patent must be construed as being limited to that embodiment") (quoting *Liebel-Flarsheim*, 358 F.3d at 906).  The Court should have construed claims should be construed to cover that broader disclosure of corresponding structure.

The District Court also misapplied the disclosure associated with Figure 2.  The disclosure associated with that Figure does not require the District Court's additional limitations.  The relevant data is not output *by* those additional resistors and coupled registers—it is instead output *through* those components.  That type

of enabling structure, which does not actually perform the recited function is not corresponding structure. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended . . . .").

The relevant aspects of Figure 2 are depicted below, including the chip code register (10), the preamble register (11), the address register (12), resistors R6 and R7, and an oscillator (2).



J.A. 27, '577 Patent, Fig. 2 (certain components erased).

In this embodiment, the chip code register (10) is coupled to the modulation input of the oscillator (2) "through second resistor R7." J.A. 36, '577 Patent, col. 6 ll. 22–29. Similarly, the preamble register (11) is coupled to the modulation input of the oscillator (2) "through first resister R6." *Id.* at col. 6 ll. 30–42. The address

register is likewise connected to the oscillator through the preamble register (11) and resistor R6.    J.A. 27, '577 Patent, Figure 2.    During transmission, the information in each register is transmitted through these components—the data in the chip code register (10) is transmitted through R7; the data in the preamble register (11) is transmitter through R6; and the data in address register (14) is transmitted through the preamble register and through R6.    But none of those components through which the data passes through actually perform the "outputting" function.    Instead, as the portions of the specification above confirms, only the relevant registers perform the outputting function: the chip code register outputs the chip code; the preamble register outputs the preamble; and the address register outputs the address.    The specification also confirms that, upon output from those registers, the relevant data is already in the form of a modulating voltage.    J.A. 34, '577 Patent, col. 2 ll. 9–33

The District Court concluded that these additional components were required because the chip code "first passes through resistor R7," J.A. 14, resistor R6 "is a necessary component in the voltage modulation process," J.A. 17, and the address register is "coupled through a preamble register and resistor R6," J.A. 18.    But none of those components, even under the Court's view, actually perform the outputting function—they enable that function by providing a passive pathway for the data or virtue of being involved in the "voltage modulation process" in Figure

41

2. And enabling structure is not corresponding structure.

### C.    The Patent Act Requires the Construction of Means-Plus-Function Limitations to Include "Equivalents"

The construction of the mean-plus-function limitations, including "chip code generation means," "preamble means," "address means" limitations, should include "and equivalents."    The Patent Act requires it: the statute expressly mandates that means-plus-function limitations "***shall be construed to cover*** the corresponding structure, material, or acts described in the specification ***and equivalents thereof***."  35 U.S.C. § 112, ¶ 6 (emphases added).  Consistent with the statute, this Court has concluded that "[u]nder section 112 ¶ 6, now recodified as 35 U.S.C. section 112(f), a means-plus-function claim limitation includes both the corresponding structures disclosed by the specification as means of performing the function, ***and the equivalents of those structures***." *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) (emphases added); *see also Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (construing a means-plus-function term as "all structure in the specification corresponding to the claimed function . . . and, ***of course, equivalents of these structures***").

The District Court omitted "and equivalents" from the construction of the means-plus-function limitations.  It did so because the scope of equivalents under

§ 112 ¶ 6 is a factual determination, not a claim construction issue.  J.A. 12–13 n.6.

That was error.  NorthPeak agrees that the scope of equivalents—whether the accused structure within an accused product is equivalent to the corresponding structure in the specification—is an infringement question for a jury.  *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991).  But that infringement analysis does not bear on the proper scope of the claims under § 112 ¶ 6.  *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("It is only *after* the claims have been construed *without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.") (emphasis in original).  And the statute unequivocally *requires* that "and equivalents" is included in what a means-plus-limitation "shall be construed to cover."  Whether the Defendants' accused products contain an equivalent is a separate fact question for a jury.  Accordingly, the District Court erred when it omitted "and equivalents" from the construction of the disputed means-plus-function limitations.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons detailed above, NorthPeak respectfully requests that this Court reverse the claim constructions of the District Court and, accordingly, reverse the entry of final judgment on noninfringement.

Dated: March 14, 2016              Respectfully submitted,

_____

**CHRISTIAN HURT**

**DEREK GILLILAND**
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlawfirm.com

**CHRISTIAN HURT**
**NIX PATTERSON & ROACH, L.L.P.**
1845 Woodall Rodgers Freeway, Suite 1050
Dallas, Texas 75201
972.831.1188 (telephone)
972.444.0716 (facsimile)
christianhurt@nixlawfirm.com

*Attorneys for Appellant NorthPeak Wireless,*
*LLC*

**ADDENDUM**

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.
ATTEST:
SUSAN Y. SOONG
Clerk, U.S. District Court
Northern District of California

Yumiko Saito
by:_____
    Deputy Clerk
Date: January 12, 2016

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

NORTHPEAK WIRELESS, LLC,

        Plaintiff,

    v.

3COM CORPORATION, et al.,

        Defendants.

Case No.  09-cv-00602-SI

**CLAIM CONSTRUCTION ORDER FOR U.S. PATENT NO. 4,977,577**

      On August 26, 2015, the Court heard argument on the parties' proposed claim constructions. Having considered the arguments made by the parties and the papers submitted, the Court construes the disputed terms as follows.

## BACKGROUND

**I.    Procedural Background**

      On November 1, 2008, North Peak filed a complaint alleging that defendants infringed US Patent Nos. 4,977,577 (the '577 Patent) and 5,987,058 (the '058 Patent). Docket No. 1.  On January 1, 2009 and March 6, 2009 Intel filed motions to intervene. On March 27, 2009, the Court granted Intel's motion. Docket No. 335. In September of 2009, Intel filed an *ex parte* reexamination request for the '577 and '058 Patents with the U.S. Patent and Trademark Office ("PTO"). Docket No. 489, 7/24/14 Joint Status Report. The examiner found the challenged claims of the '058 patent to be unpatentable. *Id.* On June 28, 2011, the PTO found that all the challenged claims of the '577 Patent were patentable. *Id.* On August 30, 2013, Intel initiated a second *ex parte* reexamination request for the '577 Patent, and on May 20, 2014, the PTO once again confirmed the patentability of the challenged claims. *Id.* Now before the Court, are the parties' claim

United States District Court
Northern District of California

construction briefs. Docket Nos. 573, 575, 580.

## II.    Factual Background

The '577 Patent, entitled "Wireless Alarm System," discloses a system which employs direct sequence spread spectrum ("DSSS") technology to transmit radio frequency ("RF") signals. Sensors, placed throughout a building or a room, are used to detect events such as "smoke, heat, [or] unauthorized entry." The '577 Patent 1:66. The sensors then transmit messages to one-way spread spectrum transmitters, which then relay the message to receivers using RF signals. The receivers, in turn, relay the message to a computer for display. *Id.* 5:22-25.

The transmitters send out data packets which are comprised of a "preamble," followed by an "address," followed by "data." The preamble tells the designated receiver to "turn on"; this process is known as synchronization. The address identifies which transmitter is sending the message, and can sometimes also identify which receiver is the desired recipient. The data provides the underlying message (i.e. "smoke detected"). Each component part of the data packet is comprised of a series of 0s and 1s, known as "bits." These bits are stored in designated "registers" ("preamble register," "address register," "data register").

The bits move through the registers one at a time, pass through a resistor, and enter into an oscillator. As they enter the oscillator, they are modulated using the DSSS technique.[1] This technique involves the use of a "chip code" which takes each individual bit from the preamble, address, and data registers, and "spreads" them into a series of 1s and 0s – known as "chips" (the chip code is also stored in a dedicated register and passes through a resistor before entering the oscillator). For example, let us say that the chip code modulates every 1-bit into a series of five 1s ("11111"), and modulates every 0-bit into a series of five 0s ("00000"). The receivers are equipped with the same chip code as the transmitters, which allows them to decode the chips back into bits.

---

[1] The parties disagree as to where the spreading actually occurs. Plaintiff contends that spreading occurs where the two resistors meet, *see* '577 Patent Fig. 2 at R6, R7, while defendants claim that spreading occurs in the oscillator. *See id.* Fig. 2 at 2.

United States District Court
Northern District of California

An advantage of using the DSSS technique is that it spreads the bits into a longer pattern of chips, and thereby increases the likelihood that the intended RF signal makes it to the intended receiver. This is because the RF signals have to contend with interference (i.e. other RF signals, or electromagnetic waves) which may block part or all of the desired signal. Using the example above, if the transmitter were to send the message "11111," and two of the three 1-chips were blocked by interference, the receiver would still be able to decode the message as a 1-bit. Conversely, if the transmitter did not employ DSSS, and simply sent a single 1-bit, it carries a greater risk that the entire message will be lost to interference.

This process of using spread spectrum technology to modulate data packets comprised of a preamble, address, and data to send RF signals has been in existence for many decades. *See e.g.* Def. Exh. B, Kahn, Robert E., et al., *Advances in Packet Radio Technology*, Proceedings of the IEEE, Vol. 66 No. 11 (Nov. 1978); Def. Exh. C, Dickson, F.H., *Packet Radio Communications, Quarterly Technical Report*, NTIS #AD786155, Collins Radio Company (Sept. 1974). However, as will be discussed in further detail below, plaintiffs successfully distinguished the '577 Patent from prior art during both of the reexaminations.

North Peak asserts Claims 9, 12, 13 and 14 against defendants. These claims cover only the transmitters – not the sensors, receivers, or computer. The parties dispute the construction of nine terms that appear in these claims.

## LEGAL STANDARD

### I. Claim Construction Principles

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at

United States District Court
Northern District of California

1    1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The

2    appropriate starting point . . . is always with the language of the asserted claim itself." *Comark*

3    *Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc.*

4    *v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

5       Accordingly, although claims speak to those skilled in the art, claim terms are construed in

6    light of their ordinary and accustomed meaning, unless examination of the specification,

7    prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro*

8    *Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The

9    written description can provide guidance as to the meaning of the claims, thereby dictating the

10    manner in which the claims are to be construed, even if the guidance is not provided in explicit

11    definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242

12    F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by

13    implication" such that the meaning may be "found in or ascertained by a reading of the patent

14    documents." *Vitronics*, 90 F.3d at 1584 n.6.

15       In addition, the claims must be read in view of the specification. *Markman*, 52 F.3d at

16    978. Although claims are interpreted in light of the specification, this "does not mean that

17    everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper*

18    *Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment

19    described in the specification generally should not be read into the claim language. *See Comark*,

20    156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be

21    consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification

22    reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently

23    with that limitation. *Id.*

24       Finally, the Court may consider the prosecution history of the patent, if in evidence.

25    *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to

26    exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies,*

27    *Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this

28    intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583.

Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## II.     Means-Plus-Function Terms

Means-plus-function terms are governed by 35 U.S.C. § 112(f):

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Under this "provision, an applicant can describe an element of his invention by the result accomplished or the function served, rather than describing the item or element to be used (*e.g.,* 'a means of connecting Part A to Part B,' rather than 'a two-penny nail')." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27 (1997). When using the means-plus-function format, "[t]he applicant must describe in the patent specification some structure which performs the specified function." *Valmont Industries, Inc. v. Reinke Manufacturing Co., Inc.*, 983 F.2d 1039, 1042 (Fed.Cir.1993). "The first step in construing such a limitation is a determination of the function of the means-plus-function limitation. The next step is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is 'corresponding' structure only if the specification . . . clearly links or associates that structure to the function recited in the claim." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (internal quotations and citations omitted). It is

United States District Court
Northern District of California

United States District Court
Northern District of California

therefore not enough that structures be able to perform the corresponding function if they are not "clearly linked" in the specification. *Id.* "The 'cost' of using a § 112[f] function statement, especially if done unintentionally, is that the scope of the claim is restricted to the particular structures or acts disclosed in the specification, as well as their equivalents." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, No. IP96-1718-C-H/G, 2000 WL 1765358, at *11 (S.D. Ind. Nov. 29, 2000) (citing *Personalized Media Communications, LLC v. International Trade Comm'n*, 161 F.3d 696, 703 (Fed.Cir.1998)).

The burden of proof that a disputed claim is subject to § 112(f) rests with the party asserting the means-plus-function construction. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003). While the use of the word "means" creates a presumption of a means-plus-function term, it is not by itself sufficient. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed.Cir. 2002) ("mere use of the word 'means' after a limitation, without more, does not suffice to make that limitation a means-plus-function limitation."). The presumption is rebutted if the claim recites sufficient structure to perform the claimed function. *Id.*; *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996).

## DISCUSSION

The asserted claims, with the disputed terms in bold are as follows:

9. An apparatus coupled to **modulation means** having a modulation input for **modulating an RF signal** with spread spectrum for reducing interference, for controlling said spread spectrum transmitter, said apparatus comprising:

    **chip-code-generation means** coupled to the modulation input of said **modulation means** for **storing** a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to the modulation input of said **modulation means**;

    **preamble means** coupled to the modulation input of said **modulation means** for **storing** a preamble, and outputting the preamble as a modulating voltage to the modulation input of said **modulation means**;

    **address means** coupled to the modulation input of said **modulation means** for **storing** a device address, and outputting the device address as a modulating voltage to the modulation input of said **modulation means**; and

wherein said **preamble means**, and said **address means**, sequentially output the preamble, and device address, to the modulation input and the spread spectrum chip code from said **chip code generating means** spread the preamble, and device address at the modulation input to generate the spread spectrum of an RF signal, and wherein the preamble provides acquisition for spread spectrum snychronization of the spread spectrum of the RF signal, for demodulating the spread spectrum of the RF signal.

12. The apparatus as set forth in claim 9 further including error-detection means coupled to said[2] **data register** for generating an error detection algorithm.

13. A method using processor means for controlling a spread spectrum transmitter having an **oscillator with a modulation input** and an RF power amplifier with a keying input, comprising the steps, performed by said processor means, of:

      **storing** a spread spectrum chip code in **chip code generation means** coupled to the modulation input of said oscillator;

      outputting, during a transmitting interval, a preamble from a **preamble register** to the modulation input of said oscillator;

      outputting, during a transmitting interval, a device address from an **address register** coupled to the modulation input of said oscillator;

      outputting simultaneously, during the transmitting interval, data from a **data register** and the spread spectrum chip code **stored** in said **chip code generation means**, to the modulation input of said oscillator, thereby generating a spread spectrum signal including the data; and

      generating an enabling signal and a keying signal during the transmitting interval, from a timing circuit coupled to the enable input of said oscillator and to the keying input of said RF power amplifier, for activating said oscillator and said RF power amplifier.

14. A method using processor means for controlling a spread spectrum transmitter having an **oscillator with a modulation input**, comprising the steps, performed by said processor means, of:

      outputting, during a transmitting interval, a preamble from a **preamble register** to the modulation input of said oscillator;

      outputting, during a transmitting interval, a device address from an **address register** coupled to the modulation input of said oscillator; and

      outputting simultaneously, during the transmitting interval, data from a **data register** and a spread spectrum chip code **stored** in **chip code generation means**, to the

---

    [2] At oral argument plaintiff noted that Claim 12 should read "a data register," and that this mistake was due to a drafting error.

United States District Court
Northern District of California

modulation input of said oscillator, thereby generating a spread spectrum signal including the data.

## I.    "Register" (Claims 12, 13, 14)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a designated or specific region of memory in a computer processor" | "a designated or specific region of memory in a computer processor, but not a regular memory, random access memory, or memory buffer" |

As noted above, the registers referenced in the '577 Patent store the component bits of the preamble, address, and data before they are modulated and sent out as RF signals. Defendants argue that the specification and prosecution history reflect the common understanding that registers are distinct from regular memory, random access memory, or memory buffers in a number of ways. Namely, that "unlike regular memory (which can hold large blocks of information), registers are too small to hold more than a few bytes" and are accessed by their name rather than through an address. Def. Opp'n at 6.

During the reexamination process, North Peak was forced to distinguish the claims of the '577 Patent from prior art references in the Dickson and Kahn publications, which disclose wireless transmitters that use DSSS to transmit packets that include a preamble, address, and data through RF signals. North Peak then argued that the references to "memory" in Kahn and Dickson did not anticipate the "registers" claimed in the '577 Patent. *See e.g.* Def. Exh. E, '577 2nd Reexam Response to Office Action at 22 ("The Dickson reference discloses that random access memory is used for 'packet buffers.' As is clear from the Dickson reference, the packet information is not stored in and outputted from the registers are [*sic.*] required in Claim 2.[3]") (internal citations omitted); *id.* at 29 ("[The Kahn] disclosure fails to disclose separate, specific memory **registers** for the preamble, address, and data. It merely indicates that this information is in memory without distinguishing whether these three types of information are stored in a single register, multiple registers, or in some other memory structure . . . [T]he Kahn reference actually

---

[3] While this passage references Claim 2, this argument is incorporated by reference throughout the document as it relates to the claims at issue in this order.

United States District Court
Northern District of California

states: 'When a packet is transmitted, the preamble, header and text are read from the microprocessor memory under direct memory access (DMA) control.' No reference is made to any '**register.**'") (emphasis in original); *see also id.* at 24, 25, 29, 32; Def. Exh. J, 2nd Reexam Interview Summary at 2 ("[T]he term 'register' has been explained to have a specific meaning which allegedly has not been taught by Dickson and Kahn . . . [North Peak] submitted that register cannot be any type of memory, hence storing information such as preamble or address in a regular memory would not anticipate claimed invention.").

North Peak's assertions during the second reexamination make clear that it believed that regular memory (including random access memory or memory buffers) was distinct from the "registers" claimed in the '577 patent. To argue otherwise would have been tantamount to conceding that many of the '577 Patent's claims were anticipated by prior art disclosed in the Dickson and Kahn publications. Indeed, the definition of "register" used by North Peak in its submissions during reexamination emphasizes the very attributes that defendants argue distinguish registers from regular memory — namely that registers are much smaller and are accessed by their name rather than by an address. North Peak then urged this definition of register:

> [a] small, named region of high speed memory located within a microprocessor or any electronic device capable of storing binary data. A register is usually large enough to hold only a few bytes of information and is referenced in programs by a name such as AX or SF. It is used as a holding area for specific, sometimes critical, pieces of data or information related to activities going on within the system. For example, a register might be used to hold the results of an addition operation or to hold the address of a particular location in the computer's memory.

North Peak's '577 2nd Reexam Response to Office Action at 11 (citing *Computer Dictionary* at 334, Microsoft Press (2d. Ed. 1994)).

A patentee can disavow claim scope "by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed.Cir.2008). "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed.Cir.1998); *see also Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2012 WL 3545286, at *5-6 (N.D. Cal. Aug. 16, 2012) *aff'd*, 501 F. App'x 980 (Fed. Cir. 2013). While a prosecution disclaimer requires a "clear and unambiguous disavowal of claim

United States District Court
Northern District of California

1  scope," *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003), "applicants

2  rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following . . .'

3  during prosecution and need not do so to meet the applicable standard." *Saffran v. Johnson &*

4  *Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013). Here, North Peak made numerous statements to the

5  PTO which unambiguously reject the notion that "register" may be defined to include regular

6  memory.[4] Its statements also reflect its understanding that one skilled in the art would interpret

7  registers to be distinct from regular memory, random access memory, or memory buffers.

8      While the Court generally agrees with defendants' arguments as to claim scope, it cannot

9  adopt defendants' proposed construction. Defendants' construction is essentially a non-

10  infringement argument under the thinly-veiled guise of claim construction. Moreover, defining a

11  term by a non-exhaustive list of the things that it is not, is clumsy and imprecise solution.

12  Therefore the Court will rely on the dictionary definition cited by North Peak during the

13  prosecution, and define "register" to mean: "a small, named region of high speed memory located

14  within a microprocessor or any electronic device capable of storing binary data. A register is

15  usually large enough to hold only a few bytes of information and is referenced in programs by a

16  name, rather than an address."

18  **II.    "Preamble Register," "Address Register," and "Data Register" (Claims 12, 13, 14)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction proposed. | "an explicit register that stores and outputs the transmitted [data/address/preamble]" |

22      Defendants argue that North Peak relied on the term "explicit register" to overcome prior

23  art during the reexamination process, and that it should therefore be included in the definition.

24  North Peak argues that the use of the modifier "explicit" is redundant and unnecessary. North Peak

---

26

27      [4] While the specification does at one point describe "chip words" being stored in random

28  access memory, this portion of the written description relates to receivers, which are not covered
    by the claims at issue. Patent '577 Patent 10:63-66.

United States District Court
Northern District of California

further argues that the term "transmitted" should be omitted from the definition because it gives the misleading impression that the data which is transmitted is the same as the data that is stored.

While the term "explicit register" does not appear in the patent, the patent clearly contemplates the use of three separate registers, each dedicated to storing and outputting the preamble, address, and data, respectively. '577 Patent 6:30-62. North Peak highlighted this feature of the invention to distinguish it from prior art throughout the prosecution history. *See* '577 2nd Reexam Response to Office Action at 29 ("the Kahn reference fails to disclose the explicit register structure of Claim 2[5], which recites separate claim elements for a 'preamble register,' an 'address register,' and a 'data register.'"); Def. Exh. G, Amendment to Application 3/20/1990 at 11 ("The difference between Eden et al. and the claimed invention, as stated by the Examiner, is the use of explicit registers to store the preamble, address, chip code and data to modulation."). Accordingly, the use of the modifier "explicit" is not mere surplusage as North Peak suggests.

However, North Peak is correct to assert that "[t]here is no requirement in the claim that the 'preamble,' 'address,' or 'data information' stored and outputted by those registers is the 'transmitted' version of those values." Pl. Brf. at 15. Indeed, as noted above, the bits that are stored and outputted by the registers are later "spread" using a chip code which converts them into a series of chips before they are transmitted.

Therefore, the Court construes "[preamble/address/data] register" to mean "an explicit register that stores and outputs [preamble/address/data] information."

### III.   "Storing/Stored" (Claims 9, 12)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction proposed. | "writing/written" |

North Peak argues that "stored" is used in its plain and ordinary sense as one skilled in the art would understand it. It suggests its plain meaning is "placed, retained, or inserted," and therefore needs no further construction. Pl. Rep. at 7. Defendants propose construing "stored" to

---

[5] *See* nt. 3, *supra*.

mean "written." They reason that the only components described as performing the "storing" function are different types of memory. Defendants argue that "writing" connotes that the information is being stored to memory, and is therefore a more appropriate construction because every time the word stored is used in the patent it refers to registers or some other type of memory. Def. Opp'n at 17. North Peak agrees that "writing/written" is a proper way to define storing information to memory; however it disagrees that the word "store/stored" is always used to describe memory. It cites Claims 13 and 14 which recite "storing" the chip code in a "chip code generation means." North Peak argues that this chip code generation means could encompass a non-memory component such as hardware logic, and therefore cannot be characterized as being "written" to. However for the reasons stated below, *see* Section IV(B), *infra*, the Court disagrees that a "chip code generation means" can encompass a non-memory component. Accordingly, the Court construes "storing/stored" to mean "writing/written."

## IV.    "Chip Code Generation Means" (Claims 9, 12, 13, 14)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| In Claims 9 and 12, means-plus-function: | Means-plus-function: |
| Function: "storing a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to the modulation input of said modulation input of said modulation means" | Function: "(1) storing a spread spectrum chip code; (2) outputting the spread spectrum chip code as a modulating voltage to the modulation input of a modulation means or oscillator." |
| Structure: "a recirculating shift register, a shift register with exclusive ORed feedback taps, or the circuit of Fig. 3B, and equivalents"[6] | Structure: "recirculating shift register (10) shown in Fig. 2 and described at 6:22-29, resistor R7 shown in Fig. 2 and described at 6:40-42, and 7:64-8:5, and additional circuitry |

_____

[6] Plaintiff appends "and equivalents" to each of its proposed constructions of means-plus-function terms. "An accused device with a structure that is not identical to the structure described in the patent will literally infringe the patent if the accused device performs the identical function required by the means-plus-function claim with a structure identical *or equivalent* to that described in the patent." *PCTEL, Inc. v. Agere Sys., Inc.*, No. C 03-2474 MJJ, 2005 WL 2206683, at *4 (N.D. Cal. Sept. 8, 2005) (emphasis added). Structural equivalence under § 112[f] is, as noted by the Supreme Court, 'an application of the doctrine of equivalents . . . in a restrictive role.'" *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citing *Warner–*

United States District Court
Northern District of California

| In Claims 13 and 14: "circuitry that provides a chip code." | required to store a spread spectrum chip code as shown in Fig. 2 and described at 7:20-30" |

The parties agree that, as it is used in Claims 9 and 12, "chip code generation means" is a means-plus-function term subject to § 112(f); however, North Peak contends that it is not a means-plus-function term as employed in Claims 13 and 14. As to Claims 9 and 12, the parties essentially agree on the function, but present different proposed structures.

### A.    Claims 9 and 12

Both parties agree that "a recirculating shift register" is a properly disclosed structure. However defendants argue that the structure should not include "shift register with ORed feedback taps" or "the circuit of Fig. 3B." '577 Patent 5:40-42. The specification discloses that a "chip-code-generation means may be embodied as a shift register with exclusive ORed feedback taps." *Id.* However, "[u]nless the structures are clearly associated with the claimed function, they cannot be corresponding structures for purposes of § 112[f]." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1332 (Fed. Cir. 2003). Nothing in the specification links a shift register with ORed feedback taps to the function of storing or outputting a spread spectrum chip code, and it therefore cannot be a claimed structure. *Cf.* '577 Patent 2:14-18 ("The recirculating register is coupled to the modulation input of the oscillator for storing the spread spectrum code. The recirculating register

---

*Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 28 (1997)). While claim construction is a matter of law, "[t]he scope of literally infringing 'equivalents' under § 112[f] is a factual determination" best reserved for a later stage of the litigation. *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991). Accordingly, the Court declines to include "and equivalents" in the construction of means-plus-function terms. *See Carotek, Inc. v. Kobayashi Ventures, LLC*, No. 07 CIV. 11163 NRB, 2011 WL 4056746, at *16 (S.D.N.Y. Sept. 8, 2011) ("However, we do not agree that the 'equivalent structures' language should be expressly included in the definition of the claim term . . . [W]e agree with Kobayashi that the identification of equivalent structures is an analytical step that is distinct from the identification of structure in the specification and is more appropriately reserved for an infringement analysis."); *see e.g. Network Appliance, Inc. v. Bluearc Corp.*, No. C03-5665MHP, 2005 WL 6225197, at *6 (N.D. Cal. Jan. 7, 2005) (omitting "and equivalents" from construction of means-plus function term); *but see WhatsApp Inc. v. Intercarrier Commc'ns, LLC*, No. 13-CV-04272-JST, 2014 WL 5306078, at *9 (N.D. Cal. Oct. 16, 2014) ("WhatsApp offers no reason why the statutory language, 'and equivalents thereof' should not be included in the construction of this term.").

United States District Court
Northern District of California

also outputs the spread spectrum chip code as a modulating voltage to the modulation input of the oscillator."). North Peak's desire to include "the circuit of Fig. 3B" as a structure fails for the same reason. The portion of the specification cited in support relates to receivers – not the transmitters that are covered by the claims at issue – and describes an entirely unrelated function. *See id.* 9:20-25.

Defendants argue that North Peak has omitted from its proposed structure certain components that are necessary to carry out the disclosed function. Namely, they argue that the chip code is stored through "programming circuitry," and that the chip code is output as a modulating voltage to the modulation input through "resistor R7." In sum, defendants argue that resistor R7 is necessary to create the modulating voltage, and the programming circuitry is necessary to store the chip code, and therefore they must both be included as part of the structure.

As it relates to whether resistor R7 is necessary to create modulating voltage, both parties cite the same passage:

> Included in the microprocessor 8 is a recirculating register 10 coupled to the modulation input of the voltage controlled oscillator through second resistor R7. The recirculating register 10 stores a spread spectrum chip code, and outputs, during a transmitting interval, the spread spectrum chip code as a modulating voltage to the modulation input of voltage controlled oscillator 2.

'577 Patent 6:22-29.

Read in isolation, the second sentence appears to indicate that the recirculating register supplies the voltage modulation, because it outputs the chip code "as a modulating voltage to the modulation input of voltage controlled oscillator 2." However, we know from the first sentence that before reaching the modulation input, the chip code first passes through resistor R7. Resistor R7 is described elsewhere in the specification as playing a role in the voltage modulation process. *See id.* 8:1-5 ("The voltage swing in conjunction with a *modulation setting second resistor R7* creates a proportional current which modulates voltage controlled oscillator 2 thereby generating a spread spectrum FSK signal.") (emphasis added). Conversely, the specification never states that the recirculating register alone is capable of voltage modulation. Therefore, read in light of the

A14    14

specification as a whole, one skilled in the art would understand that resistor R7 plays an "essential part" in creating the modulating voltage; it therefore must be included in the structure.  *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 236 F.3d 1363, 1367-68 (Fed. Cir. 2001).

Next, defendants argue that programming circuitry is required to perform the storing function. The specification states that "during installation of the transmitter . . . a spread spectrum chip code stored in the recirculating register 10 are loaded via programming connector 16." '577 Patent 7:20-24. However, this passage makes clear that the programing circuitry does not play any part in the storage process, but rather *loads* the chip code, which is subsequently stored in the recirculating register. While loading the chip code is a condition precedent to its storage, the programing circuitry plays no role in the function of storing itself. *See Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended.").

Accordingly, the Court construes the function of  "chip code generation means" to be: "storing a spread spectrum chip code and outputting the spread spectrum chip code as a modulating voltage to the modulation input of a modulation means or oscillator," and the structure to be: "a recirculating shift register and second resistor R7."

## B.     Claims 13 and 14

North Peak argues that "chip code generating means" is not a mean-plus-function term as it is used in claims 13 and 14. To prevail on this argument, it must overcome two presumptions: (1) the presumption that the word "means" denotes a means-plus-function claim, *see Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), and (2) the presumption that any given term carries the same meaning when used throughout the patent. "'[T]he same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions

of the claims.'" *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (quoting *Fin Control Sys. Pty, Ltd. v. OAM, Inc.,* 265 F.3d 1311, 1318 (Fed.Cir.2001)); *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1371 (Fed. Cir. 2005) ("Of course, this court interprets claim terms consistently throughout various claims of the same patent."). North Peak's only argument for construing the term differently is its unsupported assertion that, in Claims 13 and 14, there is no corresponding function recited. However, Claims 13 and 14 recite the same function as Claims 9 and 12, and the Court will therefore construe "chip code generating means" in the same fashion. *See* '577 Patent 20:27-32, 36-40, 58-61.

## V.    "Preamble Means" (Claims 9, 12)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Means-plus-function:<br><br>Function: "storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulation means"<br><br>Structure: "a preamble register, and equivalents" | Means-plus-function:<br><br>Function: "(1)storing a preamble; (2) outputting the preamble as a modulating voltage to the modulation input of said modulation means"<br><br>Structure: "shift register 11 shown in Fig. 2 and described at 6:30-39, including coarse lock cells 12 and fine lock cells 24, resistor R6 shown in Fig. 2 and described at 6:39-42 and 8:8-9, and additional circuitry required to store preamble as shown in Fig. 2 and described at 7:20-30" |

The parties agree that "preamble means" is a means-plus-function limitation, and also agree on the recited function. However, the parties disagree as to the proper corresponding structure. At the core of this disagreement is a dispute over whether a preamble register alone is able to create a modulating voltage, and then deliver the preamble information as a modulating voltage to the modulation input. North Peak contends that it can, while defendants assert that this function also requires the use of the R6 resistor and programming circuitry shown in Fig. 2 of the specification. These are precisely the same arguments the parties marshaled in their dispute concerning the construction of "chip code generation means" in Claims 9 and 12. The only difference is that instead of second resistor R7 connecting the register to the modulation input, its

1  first resistor R6. *See* Section D, *supra*.

2      North Peak relies heavily on the passage in the specification which states that "the

3  preamble means can be embodied as a preamble register." '577 Patent 2:11-12; *id* 5:39-40 (same).

4  However, this alone is insufficient to disclose structure because it makes no mention of "storing"

5  or "outputting as a modulating voltage" and therefore fails to "clearly link[] or associate[] that

6  structure to the function recited in the claim." *Medtronic*, 248 F.3d at 1311.

7      Defendants cite the following passage to show that the R6 resistor is a necessary

8  component in the voltage modulation process:

9      The preamble register 11 is coupled to the modulation input of the voltage
10     controlled oscillator 2 through first resistor R6. The preamble includes the coarse
       lock preamble and the fine lock preamble. The preamble register 11 stores a coarse
11     lock preamble in cells 12 and a fine lock preamble in cells 24. The preamble
       register 11 outputs during the transmitting interval, the coarse lock preamble and
12     the fine lock preamble as a modulating voltage to the modulation input of the
       voltage controlled oscillator 2 through first resistor R6. First resistor R6 and second
13     resistor R7 are chosen such that the desired spreading from the chip code and the
       data coming from the preamble register 11 is achieved.
14

15  '577 Patent 6:30-42

16

17      This passage puts into relief that resistor R6 is indeed necessary to create a modulating

18  voltage and ouput the information to the modulation input. Defendants also urge the Court to find

19  that the programing circuitry is necessary to accomplish the storing function; however, for the

20  reasons stated in its construction of "chip code generation means," the Court finds this argument

21  unpersuasive.

22      Accordingly, the Court construes the function of "preamble means" to be: "storing a

23  preamble, and outputting the preamble as a modulating voltage to the modulation input of said

24  modulation means," and construes the structure to be: "a preamble register and resistor R6."

25

26

27

28

United States District Court
Northern District of California

## VI.   "Address Means"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Means-plus-function: | Means-plus-function: |
| Function: "storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means" | Function: "(1) storing a device address; (2) outputting the device address as a modulating voltage to the modulation input of said modulation means" |
| Structure: "an address register, and equivalents" | Structure: "shift register 14 coupled through preamble register as shown in Fig. 2 and described at 6:43-50, resistor R6 shown in Fig. 2 and described at 6:39-42 and 8:8-9 and additional circuitry required to store an address as shown in Fig. 2 and described at 7:20-30" |

As North Peak notes, "[t]he parties' dispute for the term 'address means' tracks the disputes for 'preamble means' and 'chip code generation means.'" Pl. Rep. at 12. Accordingly, for the reasons stated in construing those two terms, the Court construes the function of "address means" as "storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means," and construes the structure to mean "an address register coupled through a preamble register and resistor R6."

## VII.   "Modulation Means" (Claim 9, 12)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Means-plus-function: | Means-plus-function: |
| Function: "modulating an RF signal with spread spectrum for reducing interference" | Function: "modulating an RF signal with spread spectrum for reducing interference" |
| Structure: "a voltage controlled oscillator, a tuned oscillator with a PSK modulator, or | Structure: "a voltage controlled oscillator as shown in Fig. 2, element 2, and described at |

A18   18

| equivalents thereof" | 5:60-68 and 8:1-8, or a capacitor and inductor tuned oscillator with PSK modulator, as described at 6:9-10" |
| --- | --- |

The parties agree that "modulation means" is a means-plus-function limitation, and agree on the recited function. The parties further agree that one of the recited structures is "a voltage controlled oscillator." As to the second structure, North Peak would omit "capacitor and inductor" from defendants' proposed construction. The entire disclosure reads: "The voltage controlled oscillator 2 also can be replaced by a capacitor and inductor tuned oscillator and a phase shift keyed modulator, or any other means for generating a signal." '577 Patent 6:7-11. North Peak makes two arguments in support of its proposed construction: (1) it cites comments it made during the prosecution supporting its own construction, and (2) it notes that it is proposing a narrower construction than what it is entitled to, given that it has omitted the "or any other means for generating a signal" language from its proposal.

During the course of the first reexamination, plaintiff espoused the same construction as it does today. *See* Pl. Exh. C at 23. However, the "the scope of [a means-plus-function] claim is not limitless, but is confined to structures expressly disclosed in the specification and corresponding equivalents." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991). Therefore, having availed itself of the convenience of expressing a claim element in means-plus-function format, North Peak cannot now rely on self-serving statements made during the prosecution to broaden the scope of the structure beyond what was actually disclosed in the specification. Next, omitting the vague catch-all "or any other means for generating a signal" from its proposed construction is hardly a concession given that it would almost certainly fail meet the requisite of § 112(f) which dictates that the "corresponding structure must include all structure that actually performs the recited function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002).

United States District Court
Northern District of California

A19
19

United States District Court
Northern District of California

1   Accordingly, the Court construes the function of "modulation means" to be: "modulating

2   an RF signal with spread spectrum for reducing interference," and the structure to be: "a voltage

3   controlled oscillator, or a capacitor and inductor tuned oscillator with phase shift key ("PSK")

4   modulator."

5

6   ## VIII.   "Modulating an RF Signal" (Claims 9, 12)

7

8

9

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | "spreading[7] preamble, address, and data bits with a spread spectrum chip code at RF, not at baseband" |

12   North Peak argues that "modulating an RF signal" requires no construction because one of

13   ordinary skill in the art would understand what the term means. However, North Peak provides no

14   technical evidence in support of this contention, nor does it provide evidence of a definition of

15   what one skilled in the art would understand the disputed term to mean. Moreover, given the

16   technical nature of the term, failing to construe "modulating an RF signal" would risk falling short

17   of the Court's duty to "ensure that the jury fully understands the court's claim construction rulings

18   and what the patentee covered by the claims." *Power-One, Inc. v. Artesyn Technologies, Inc.*, 599

19   F.3d 1343, 1348 (Fed. Cir. 2010), (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356,

20   1366 (Fed.Cir.2004)).

21   Claim 9 describes "an apparatus coupled to modulation means having a modulation input

22   for **modulating an RF signal** with spread spectrum for reducing interference, for controlling said

---

[7] Defendants originally proposed to use the word "combining," but informed the Court at oral argument that they would agree to change their proposed construction to "spreading" to address North Peak's concerns.

United States District Court
Northern District of California

spread spectrum transmitter." (emphasis added). Claim 9 later describes using the chip code to spread the preamble and address to generate an RF signal. *See id.* ("the spread spectrum chip code from said chip code generating means spread[s] the preamble, and device address at the modulation input to generate the spread spectrum of an RF signal."). The plain language of the claim describes modulating an RF signal – rather than a base band signal, or some other type of signal. It also discloses spreading the preamble and address at the modulation input. Additionally, the specification describes the preamble, address, and data information being output sequentially and later being modulated by a chip code. *See* '577 Patent 6:30-62. Indeed, this is precisely how the patentees described the invention during the application process: "The spread spectrum chip code from the chip code generating means spreads the preamble, device address, and information data, simultaneously, at the modulator to generate the spread spectrum of an RF signal." Amendment to Application 3/20/1990 at 11.

Defendants also point to the prosecution history of the continuation '058 Patent, wherein two inventors of the '577 Patent distinguish their invention from other spread spectrum transmitters that spread the signal at baseband. *See* Def. Exh. H at 26-27 ("Conventional spread spectrum transmitters created a spread signal at baseband and then up-converted the signal through mixers injected with local oscillators to obtain the desired transmit frequency. This requires expensive mixer, filter and local oscillator components or other multiplication devices. The instant invention does not require the use of these extra components, and thus has much greater commercial practicality.") (internal citations omitted). Defendants have also introduced evidence showing that an inventor of the '577 Patent agrees that the specification discloses an apparatus that creates a spread signal at the RF carrier frequency. Def. Exh. F, Rouquette Depo at 199:1-12 (**Q:** "Now would you agree that what's shown there in Figure 2 is not creating a spread signal at baseband and then upconverting it?" **A:** "I agree...It is creating the spread signal at the RF carrier frequency.").

While the Court recognizes that the prosecution history supports the notion that the modulation occurs at RF, this must be weighed against the language of the patent itself which is largely silent on that issue. The patent speaks of modulating "an RF signal" at "the modulation input" but does not describe whether that modulation occurs at RF, at baseband, or some other frequency. Furthermore, Mr. Roquette's testimony goes to a preferred embodiment, not the claims themselves. Therefore the Court declines to include the "at RF" language proposed by defendants.

This issue of whether modulation occurs at baseband or at RF is a question of infringement rather than of claim construction, and its resolution will require a more fully developed record. Accordingly, the Court construes "modulating an RF signal" to mean "spreading the preamble, address, and data bits with a spread spectrum chip code to modulate an RF signal."

## IX.    "Oscillator with a Modulation Input"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | "a voltage controlled oscillator whose frequency control input is used as a modulation input" |

Defendants urge the Court to define "oscillator" to mean a "voltage controlled oscillator" with a "frequency control" input. While the specification does disclose this embodiment, it also discloses other embodiments, such as a "capacitor and inductor tuned oscillator and a phase shift keyed modulator." '577 Patent 6:9-10. Defendants' proposed construction would improperly read limitations from the specification into the claims. While claims must be read in light of the specification, it is "improper[] [to] add a limitation appearing in the specification and the drawings, but not appearing in the unambiguous language of the claim." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001).

North Peak urges the Court that "oscillator with a modulation input" needs no construction. While the parties do not explicitly agree on this point, defendants' proposed construction makes no attempt to define these terms, but rather parrots the terms and adds additional limitations. Therefore, it appears that defendants agree that the term used in its ordinary sense would be understood by one skilled in the art.

"In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed.Cir.2005)). Here, the parties appear to agree that the meaning of "oscillator with a modulation input" is "readily apparent." Therefore, the Court will not construe the term beyond its plain and ordinary meaning. However, the Court may find it necessary to construe the term at a later stage of the litigation, should the parties find themselves in disagreement about its meaning.

## CONCLUSION

The Court construes the disputed terms as follows.

| Term | Construction |
|---|---|
| register | a small, named region of high speed memory located within a microprocessor or any electronic device capable of storing binary data. A register is usually large enough to hold only a few bytes of information and is referenced in programs by a name, rather than an address |
| [preamble/address/data] register | an explicit register that stores and outputs [preamble/address/data] information |
| storing/stored | writing/written |
| chip code generation means | Function: storing a spread spectrum chip code and |

A23   23

| | |
|---|---|
| | outputting the spread spectrum chip code as a modulating voltage to the modulation input of a modulation means or oscillator <br> Structure: a recirculating shift register and second resistor R7 |
| **preamble means** | Function: storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulation means <br> Structure: a preamble register and resistor R6 |
| **address means** | Function: storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means <br> Structure: an address register coupled through a preamble register and resistor R6 |
| **modulation means** | Function: modulating an RF signal with spread spectrum for reducing interference <br> Structure: a voltage controlled oscillator, or a capacitor and inductor tuned oscillator with PSK modulator |
| **modulating an RF signal** | spreading the preamble, address, and data bits with a spread spectrum chip code to modulate an RF signal |
| **oscillator with a modulation input** | No Construction; ordinary meaning. However, the Court reserves the right to construe the term at a later stage should it become necessary. |

**IT IS SO ORDERED**.

Dated: August 28, 2015

_Susan Illston_____

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

A24  24

# United States Patent [19]

## Arthur et al.

[11] **Patent Number:** **4,977,577**

[45] **Date of Patent:** **Dec. 11, 1990**

[54] **WIRELESS ALARM SYSTEM**

[75] Inventors: **James D. Arthur**, Costa Mesa, Calif.; **H. Britton Sanderford, Jr.**, New Orleans; **Robert E. Rouquette**, Kenner, both of La.

[73] Assignee: **Axonn Corporation**, New Orleans, La.

[21] Appl. No.: 266,461

[22] Filed: **Nov. 2, 1988**

[51] **Int. Cl.[5]** ............................................. H04K 1/00

[52] **U.S. Cl.** ...................................................... 375/1

[58] **Field of Search** ................. 375/1; 380/34; 370/71

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,222,115 | 9/1980 | Cooper et al. | 375/1 |
| 4,225,935 | 9/1980 | Zscheile, Jr. et al. | 380/34 |
| 4,241,447 | 12/1980 | Epstein | 375/1 |
| 4,313,211 | 1/1982 | Leland | 455/339 |
| 4,317,204 | 2/1982 | Gordy et al. | 375/1 |
| 4,351,064 | 9/1982 | Ewanus | 375/1 |
| 4,360,801 | 11/1982 | Duhane | 340/521 |
| 4,361,890 | 11/1982 | Green, Jr. et al. | 375/1 |
| 4,361,891 | 11/1982 | Lobenstein et al. | 375/1 |
| 4,387,465 | 6/1983 | Becker | 375/1 |
| 4,392,220 | 7/1983 | Hirosaki et al. | 375/1 |
| 4,400,790 | 8/1983 | Chambers et al. | 375/1 |
| 4,418,393 | 11/1983 | Zscheile, Jr. | 375/1 |
| 4,425,661 | 1/1984 | Moses et al. | 375/1 |
| 4,435,821 | 3/1984 | Ito et al. | 375/1 |
| 4,455,651 | 6/1984 | Baran | 375/1 |
| 4,468,784 | 8/1984 | Jagnow et al. | 375/1 |
| 4,470,145 | 9/1984 | Williams | 375/1 |
| 4,472,814 | 9/1984 | Gutleber | 375/34 |
| 4,475,215 | 10/1984 | Gutleber | 375/1 |
| 4,484,335 | 10/1984 | Mosley et al. | 375/1 |
| 4,511,887 | 4/1985 | Fiore | 340/539 |
| 4,530,008 | 7/1985 | McVoy | 375/1 |
| 4,550,312 | 10/1985 | Galloway et al. | 340/539 |
| 4,583,090 | 4/1986 | Eden et al. | 370/71 |
| 4,594,580 | 6/1986 | Nelson | 340/539 |
| 4,661,804 | 4/1887 | Abel | 340/539 |
| 4,728,935 | 3/1988 | Pantus et al. | 340/520 |
| 4,734,680 | 3/1988 | Gehman et al. | 340/539 |

*Primary Examiner*—Salvatore Cangialosi
*Attorney, Agent, or Firm*—David B. Newman, Jr. & Associates

[57] **ABSTRACT**

A wireless alarm system using spread spectrum transmitters, fast frequency shift keying, spread spectrum receivers and computer with a display. The spread spectrum transmitter includes an oscillator coupled to a microprocessor with chip code generation means, preamble register, address register and data register. The spread spectrum receiver acquires synchronization of the spread spectrum signal using a microprocessor coupled to the quieting, signal strength or baseband output of the receiver, with a two step algorithm. The steps comprise achieving a coarse lock and a fine lock to the spread spectrum signal.

**14 Claims, 8 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3A



*FIG. 3B*

FIG. 4



FIG. 5



FIG. 6



FIG. 7

4,977,577

1

# WIRELESS ALARM SYSTEM

## BACKGROUND OF THE INVENTION

This invention relates to a wireless warning system for use in a large office building, and more particularly a wireless fire warning and detection system which employs spread spectrum technology with high reliability for continuously monitoring the building.

## DESCRIPTION OF THE PRIOR ART

A number of systems and techniques have been employed in the prior art as a warning system for large buildings. These include having warning sensors for detecting fire, security, or other means wired directly to a main console, with indicators that a particular sensor has been activated. Systems also have been developed employing a radio link between the sensor and receiver. For example, U.S. Pat. No. 4,550,312 to Galloway et al. teaches the use of wideband sensors and transmitters. The sensors/transmitters transmit digital information to a central station by radio. These transmissions of messages are proceeded by an additional access code to identify a particular property. This increases the message overhead, however, which lowers system throughput and lowers battery life.

U.S. Pat. No. 4,661,804 to Abel discloses a receiver-decoder used with a plurality of encode or transmitter units using digitally encoded addresses. This use of multiple redundant 35 second interval short transmissions is used to achieve reliable throughput.

U.S. Pat. No. 4,734,680 to Gehman et al. teaches the use of a pseudorandom number to lower probability of repeat data collisions. The Gehman invention provides for only four bits or sixteen time slot positions over which to transmit, which are inadequate for large systems with hundreds of transmitters. The Gehman disclosure does not teach the use of a randomization interval with hundreds of possible of time slots with spread spectrum so that a destructive data collision can only occur in one chip time. Further, the Gehman patent does not teach the use of the transmitters unique address as a seed to the pseudorandom number generator, preventing two transmitters from drifting into lockstep transmitting schedule.

## OBJECTS AND SUMMARY OF THE INVENTION

An object of the present invention is to provide a wireless warning system having a high reliability for transmitting digital data via radio waves from an alarm or data transmission device to a remotely located receiver.

Another object of the invention is to provide a wireless warning system capable of data error detection and error correction using redundancy, for increasing communications reliability.

A further object of the invention is to provide a wireless warning system having a safety margin against jamming and undesirable interference.

According to the present invention, as embodied and broadly described herein, a wireless warning system is provided comprising a plurality of sensors coupled to a plurality of spread spectrum transmitters, respectively. The plurality of sensors are for detecting or warning against smoke, heat, unauthorized entry, or other sensing device to indicate some particular function in a room of a building. The system further includes at least

2

one spread spectrum receiver having polar diversity antennas and microprocessor having a display, with the microprocessor coupled to the spread spectrum receivers.

An apparatus coupled to a modulation input of an oscillator of a spread spectrum transmitter is provided for controlling the spread spectrum transmitter, which includes chip-code-generation means, preamble means, address means, and data means. The chip-code-generation means can be embodied as a recirculating register, the preamble means can be embodied as a preamble register, the address means can be embodied as an address register, and the data means can be embodied as a data register. The recirculating register is coupled to the modulation input of the oscillator for storing the spread spectrum code. The recirculating register also outputs the spread spectrum chip code as a modulating voltage to the modulation input of the oscillator. The preamble register is coupled to the modulation input of the voltage controlled oscillator. The preamble register stores a preamble, and outputs, during a transmitting interval, the preamble as a modulating voltage to the modulation input of the voltage controlled oscillator. The preamble may include a coarse lock preamble and a fine lock preamble.

The address register is coupled to the modulation input of the voltage controlled oscillator through the preamble register. The address register stores a device address and a type code, and outputs, during a transmitting interval, the device address and the type code as a modulating voltage to the modulation input of the voltage controlled oscillator.

The data register is coupled to the data input and to the modulation input of the voltage controlled oscillator through the preamble register and the address register. The data register stores data received from the data input, and outputs, during the transmitting interval, the data as a modulating voltage to the modulation input of the voltage controlled oscillator.

The present invention further includes a error detection means coupled to the data register for putting a redundancy check word at the end of a data sequence, for error detection.

A timing circuit is provided coupled to the enable input of the voltage oscillator for enabling the voltage controlled oscillator during the transmitting interval. The timing circuit also is coupled to the keying input of the RF power amplifier for enabling an RF power amplifier during the transmitting interval. Additionally, a pseudorandom sequence generator is coupled to the timing circuit for generating a random number for modifying the timing duration between each transmitting interval.

The present invention also includes an apparatus for generating a spread spectrum chip code for use with a receiver, including means for entering the spread spectrum chip code having n single chips. The entering means may be embodied as a hand terminal. The apparatus further includes memory means for storing chip words, each chip word having a plurality of bits. The memory means may include a random access memory (RAM) or other memory device. Also included is a processing means coupled to the entering means and to the memory means, and responsive to receiving the spread spectrum chip code for transforming a single chip of the spread spectrum chip code to a chip word and storing the chip word in memory means. The pro-

4,977,577

**3**

cessing means may be, for example, a microprocessor or other electronic circuit device to accomplish these functions. Additionally, counting means are included coupled to the memory means for sequencing through n addresses of the chip words stored in the memory means, and sequentially outputting the chip words to the receiver.

The present invention further includes an apparatus for synchronizing spread spectrum chip code using a two step algorithm in a process coupled to a receiver having a quieting output. The apparatus includes means for correlating a first signal from the quieting output of the receiver with multiple code iterations of the spread spectrum chip code by comparing the first signal to an adaptive average to be exceeded by a preset margin. The means for correlating includes determining whether the amplitude of the first signal exceeds the preset margin. Included are means coupled to the correlating means for computing the adaptive average, in response to the first signal not exceeding the preset margin. The computing means adds the amplitude of the first signal to the previously computed adaptive average. Means coupled to the quieting output of the receiver is provided for correlating a second signal in response to the first signal exceeding the preset margin. The second signal is correlated with a portion the time duration of multiple code iterations of the spread spectrum signal. The means for correlating the second signal compares the amplitude of the second signal to an adaptive average by a preset margin to determine whether the second signal exceeds the preset margin.

A second species of the spread spectrum chip code synchronization method and apparatus, according to the present invention, is provided. The second species includes the spread spectrum chip code synchronization apparatus coupled to a baseband output of a receiver. The apparatus includes means coupled to the baseband output of the receiver for sampling and digitizing a plurality of analog signals from the baseband output of the receiver, for generating a plurality of data signals. Each of the analog baseband signals is sampled and digitized during one chip time. Register means are provided, coupled to the sampling and digitizing means, for shifting the plurality of data signals sequentially through a plurality of shift registers. Means is provided coupled to the register means for adding in parallel each of the plurality of data signals stored in the plurality of registers according to a plurality of predetermined weights for each of the plurality of data signals. The adding means generates a correlation sum.

Comparing means coupled to the adding means compares the correlation sum to a preset margin. Means coupled to the comparing means dithers a chip clock by at least one portion of one chip time, thereby improving clock lock.

A third species of the spread spectrum chip code synchronization apparatus is provided according to the present invention. The apparatus comprises means coupled to the baseband output of the receiver for sampling and digitizing a plurality of analog signals from the baseband output of the receiver. The sampling and digitizing means also generates a plurality of data signals. Each of the analog signals is sampled and digitized during one chip time.

Register means also is provided in the third species of the spread spectrum chip code synchronization apparatus, according to the present invention, coupled to the sampling and digitizing means for shifting and recircu-

**4**

lating the plurality of data signals sequentially through a plurality of shift registers. Means additionally is provided coupled to the register means for adding sequentially the data signals passing through one of the shift registers according to a predetermined weighting algorithm.

Additional objects and advantages of the inventions will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by practice of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate a preferred embodiment of the invention, and together with the description, serve to explain the principles of the invention.

FIG. 1 is a block diagrammatic view of the wireless sensor and detector system according to the present invention;

FIG. 2 is a schematic diagram of a spread spectrum transmitter;

FIG. 3A is a block diagram of a spread spectrum receiver;

FIG. 3B is a schematic diagram of a spread spectrum chip code microprocessor of the receiver;

FIG. 4 is a flow chart of the code locking algorithm;

FIG. 5 is a timing diagram of the spread spectrum chip positions;

FIG. 6 is a schematic diagram of a parallel correlator coarse lock dither circuit for proving a fine lock; and

FIG. 7 is a schematic diagram of a parallel correlator with a serial correlation sum accumulation.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made to the present preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings.

Wireless Warning Detection System

FIG. 1 illustrates the wireless warning system of the present invention. A plurality of sensors S1, S2, . . . , SN, are coupled to a plurality of spread spectrum transmitters X1, X2, . . . , XN, respectively. Also shown are the elements of a base station including a first spread spectrum receiver 502 and a second spread spectrum receiver 504, each of which are coupled to polar diversity antennas 507, 509, respectively. A microprocessor 506 having a microprocessor display is coupled to the first spread spectrum receiver 502 and the second spread spectrum receiver 504. The wireless warning detection system of FIG. 1 provides a high reliability for transmitting digital data via radio waves from a sensor S1, S2, . . . , SN. The sensor S1, S2, . . . , SN may be, for example, a smoke head detector, a security sensing device, or other initiating device or modulating device. As set forth below, the high reliability of the system includes means for data error detection and error correction.

The preferred embodiment consists of many sensor devices S1, S2, . . . , SN which may be a smoke detector, pull station, contact alarm, waterflow detector, guard station, or security access controller. These can be expanded directly to include voice modulation, local area network data link, long-range alarm monitoring, remote power meter reading, remote process control, etc.

4,977,577

5

The initiating device provides either a contact input or reflected light smoke chamber level or data byte to the spread spectrum transmitters X1, X2, . . . , XN. The spread spectrum transmitters X1, X2, . . . , XN include means for data message encoding in serial form and data integrity validation, means for re-sending the message to achieve redundancy, means for randomizing the message transmit interval to avoid repeat collisions, means for modulating the serial message into spread spectrum form and means for transmitting the spread spectrum carrier at the desired frequency.

The spread spectrum receiver's antennas 507, 509 minimize signal fading via polar diversity. Using two receivers provides redundancy as a primary and secondary means for receiving transmissions. The two polar diversity antennas provide spatial diversity against signal fading. The spread spectrum receiver 507, 509 collects the RF energy from polar diversity antenna 507, 509 and filters out undesirable frequencies. The receivers compare and synchronize desirable frequencies to the spread spectrum code of interest thereby extracting the original serial transmission. The spread spectrum receivers 507, 509 further validate the serial transmitter message and forward this information to computer 508 for display.

The spread spectrum of the present invention, in a preferred embodiment, uses fast frequency shift keying (FFSK). The techniques disclosed below are equally applicable for frequency hopping or phase shift keyed spread spectrum methods.

### Transmitter

Referring to FIG. 2, a preferred embodiment of the transmitter of the instant invention is shown including chip-code-generation means, preamble means, address means, data means, timing means, pseudorandom-sequence means, and error-detection means. The chip-code-generation means may be embodied as a recirculating register 10 and the preamble means may be embodied as a preamble register 11. The chip-code-generation means may be embodied as a shift register with exclusive ORed feedback taps. The address means may be embodied as an address register 14, the data means may be embodied as a data register 18, and the error-detection means may be embodied as cyclical-redundancy-check (CRC) generator 19. The timing means may be embodied as timing circuit 13, and the pseudorandom sequence means may be embodied as the random number generator 17.

In the exemplary arrangement shown, a microprocessor 8 includes the recirculating register 10, preamble register 11, address register 14, data register 18, CRC generator 19, random number generator 17, and timing circuit 13. The timing circuit 13 is embodied as a timing algorithm in software, located in microprocessor 8. Alternatively, these registers and circuits may be put together with discrete components or independently wired and constructed as separate elements, as is well known in the art.

As shown in FIG. 2, an oscillator, which is shown as a voltage controlled oscillator 2 is coupled to an RF power amplifier 3, and the RF power amplifier 3 is coupled through a bandpass filter 4 to a micropatch or equivalent antenna 5. The voltage controlled oscillator 2 includes an enable input and a modulation input, where the voltage controlled oscillator generates a spread spectrum signal in response to a modulating voltage being applied to the modulation input. The

6

voltage controlled oscillator 2 is enabled by applying an enable signal to the enable input. The RF power amplifier 3 has a keying input and will amplify a signal from the voltage controlled oscillator 2 only if a keying signal is applied to the keying input. The voltage controlled oscillator 2 alternatively can be frequency locked to the microprocessor's crystal to improve stability. The voltage controlled oscillator 2 also can be replaced by a capacitor and inductor tuned oscillator and a phase shift keyed modulator, or any other means for generating a signal.

The microprocessor 8 is coupled to the modulation input of the voltage controlled oscillator 2 through first resistor R6 and second resistor R7. The microprocessor 8 broadly controls the voltage controlled oscillator 2 by supplying an enable signal to the enable input of the voltage controlled oscillator 2, and a modulating voltage to the modulation input of the voltage controlled oscillator 2. Also, the microprocessor 8 controls the RF power amplifier 3 by supplying a keying signal to the keying input of the RF power amplifier 3.

Included in the microprocessor 8 is a recirculating register 10 coupled to the modulation input of the voltage controlled oscillator 2 through second resistor R7. The recirculating register 10 stores a spread spectrum chip code, and outputs, during a transmitting interval, the spread spectrum chip code as a modulating voltage to the modulation input of voltage controlled oscillator 2.

The preamble register 11 is coupled to the modulation input of the voltage controlled oscillator 2 through first resistor R6. The preamble includes the coarse lock preamble and the fine lock preamble. The preamble register 11 stores a coarse lock preamble in cells 12 and a fine lock preamble in cells 24. The preamble register 11 outputs during the transmitting interval, the coarse lock preamble and the fine lock preamble as a modulating voltage to the modulation input of the voltage controlled oscillator 2 through first resistor R6. First resistor R6 and second resistor R7 are chosen such that the desired spreading from the chip code and the data coming from the preamble register 11 is achieved.

Also shown in FIG. 2 is an address register 14 coupled to the modulation input of the voltage controlled oscillator 2 through the preamble register 11 and first resistor R6. The address register 14 stores a device address and a type code, and outputs during a transmitting interval, the device address and type code as a modulating voltage to the modulation input of the voltage controlled oscillator 2.

A data register 18 is coupled to a data input 20 and to the modulation input of the voltage controlled oscillator 2 through the preamble register 14 and the address register 11. The data register 18 stores data received from the data input, and outputs, during the transmitting interval, the data as a modulating voltage to the modulation input of the voltage controlled oscillator 2. The data from the preamble register 11, address register 14, and data register 18 are outputted in sequence, and at the end of a sequence, the cyclical redundancy check generator 19 outputs a data word at the end of the code for error detection.

A timing circuit 13 is included in microprocessor 8, and is coupled to the enable input of the voltage controlled oscillator 2 and to the keying input of the RF power amplifier 3 for enabling the voltage controlled oscillator 2 and the RF power amplifier 3, by outputting an enable signal to the enable input and a keying signal

A36

4,977,577

<table>
<tr><td>7</td><td>8</td></tr>
</table>

to the keying input of the RF power amplifier 3, respectively, during the transmitting interval. In essence, voltage controlled oscillator 2 and RF power amplifier 3 are not active or activated during a time duration of non-transmission, and are only activate during a transmission interval. The time duration between transmission intervals is made to vary in response to the random number generator 17 generating a random number and transferring the random number to the timing circuit 13. The random number modifies the timing duration between each transmitting interval randomly.

Also shown are the voltage supply, regulator circuit 1, and battery low detector 25.

The spread spectrum transmitter monitors one or more data inputs 20 and transmits periodically a supervisory data message. One or more of the data inputs 20 can be set 21 such that they cause a priority transmission at an increased rate higher than the supervisory message rate.

During installation of the transmitter, a device address (1-4095) 12, "Type" code 15 (fire, security, panic, heat, pull station, etc.) stored in preamble register 11, and a spread spectrum chip code stored in recirculating register 10 are loaded via programming connector 16. At installation time the "Panel" computer assigns the 25 device ID address to each room number or unique device in the system which is to be monitored. The panel computer then prints a sticky label with the device's ID, address, type code and spread spectrum chip code, both in decimal and bar code form. The label is fixed to the smoke detector or alarming device and via the programming connector 16, or the number can be entered manually with the aid of a hand-held terminal. Alternatively a bar code reader can be connected to the programming connector 16 and the device can be read electronically from the bar code and entered into the transmitter. Microprocessor timing is controlled by crystal 23. Transmit timing is controlled by the wake-up timer 9, which has its own low power oscillator.

In operation, the transmitter sends a supervisory message often enough so that the receiver can detect failure of any transmitter within 200 seconds. The microprocessor 8 effectively "sleeps" between these transmissions to conserve battery life while counter 9 counts down to wake-up microprocessor 8. In order to minimize the chance of reoccurring data collisions from multiple simultaneous transmitters, the transmit interval is modified by random number generator 17. Very fine resolution intervals are used equal to 500 temporal transmit positions. The random number generator 17 is seeded with the transmitter's unique address 14, resulting in different transmit schedules for each unit, thereby avoiding continuous collisions between transmitters.

Once the microprocessor 8 is reset by the wake-up circuit 9 the timing circuit 13 allows the crystal 23 to stabilize for 1–5 ms. The timing circuit 13 then enables the transmitter oscillator 2 and allows it to stabilize for 1 ms. The timing circuit 13 subsequently enables the RF amplifier 3 by sending a keying signal to the keying input. The RF energy from the RF amplifier 3 is filtered by bandpass filter 4 to reduce spurious RF emissions. The filtered signal is passed to a PCB foil micropatch 2 dBi gain antenna 5 which radiates the RF energy to an appropriate receiver. When the timing circuit 13 keys the RF power amplifier 3 it also begins to recirculate the spread spectrum 31 chip code stored in recirculating register 10 at a chip rate of 1 to 1.3 MHz. The chip code in turn causes a voltage swing 0–5 volts at the modula-

tion input of the microprocessor. The voltage swing in conjunction with a modulation setting second resistor R7 creates a proportional current which modulates voltage controlled oscillator 2 thereby generating a spread spectrum FSK signal. This improves the signal to noise ratio at the receiver by reducing required bandwidth and minimizes the chances for intersecting interference. The data is super imposed on the chip code by the resistor 6 as a 1/31 deviation of the total modulation. Two or three adjacent chip code sequences are used to equal one bit time resulting in a baud rate of 14–21 KB/s.

In order for a receiver to demodulate a spread spectrum chip code, it must time lock onto the spread spectrum chip code. Disclosed are three methods of this timing acquisition, one is serial and two are parallel assisted. All methods require some synchronization bits in the transmitted message specifically allocated to code timing acquisition, which allow the receiver to search the code and find a correlation peak. The serial correlator searches one bit time per chip in the code sequence to achieve a ±½ chip code lock. This search can be hastened by searching one code sequence time instead of one bit time thereby providing a two or three to one speed increase. The parallel correlator searches all 31 chip sequences in parallel so that an initial ±½ chip synchronization ("lock") can be achieved in one bit or one chip code sequence time. "Fine" code lock (±¼ chip) for either serial or parallel assisted schemes must be followed by transmitted bit times allocated to allowing the receiver to achieve a higher resolution correlation "time" lock. One-quarter chip lock accuracies perform to within 1.25 dB of optimal code alignment. The receiver's fine code lock algorithm seeks to optimize the correlation peak. Higher levels of code lock can be achieved by searching in smaller fractions of a chip. This can facilitate "time of flight" distance or location measurement applications such that 25 ns, 25 feet, of measurement resolution can be achieved.

The transmitter's microprocessor 8 stores a synchronizing preamble in preamble register 11 of 36 bits for a serial correlator, which are broken into 31 bits for coarse lock 11 and 5 bits for fine lock 12. For the two parallel correlation methods disclosed 6 bits are used in the synchronizing preamble, 1 bit for coarse lock and 5 bits for fine lock. The actual code locking bits are transmitted as alternating ones and zeros so that the receiver's data demodulator can adaptively choose an optimal 1/0 voltage level decision point. The preamble is followed by a single data message synchronization bit 24 then 12 ID address bits 14 and 3 unit type bits 15 from address register 11, then 8 bits of input data from data register 18 and lastly 16 bits of CRC-16 data integrity check 19. The CRC-16 generator 19 is based on the entire proceeding message.

Once the message is transmitted, the timing circuit 13 turns off the enable signal at the enable input to voltage controlled oscillator 2 and the keying input of RF power amplifier 3, regenerates a new random number from random number generator 17, presets that number into the transmit interval wake-up circuit 9 and then sets the microprocessor 8 into the sleep mode. Battery voltage regulation is provided by a micropower regulator 1. Battery voltage is pulse tested to conserve battery life 25.

The CRC-16 generator can have its kernel seeded with an identification number unique to each facility. For example, the kernel can be set by the facility ad-

4,977,577

9    10

dress. Any facility having a transmission system which uses such a unique code as the kernel for the CRC-16 generator can be separated from adjacent facilities without additional transmission time or message bits.

### Receiver

The spread spectrum receiver comprises several major blocks:

A. The RF section which converts the received signal to lower frequencies;

B. Chip code generator with means of chip code phase shifting for correlation lock;

C. Means to measure both signal strength and quieting to detect correlation lock over the dynamic range of the system;

D. An adaptive data demodulator tolerant to DC i.e.: long strings of 1's or 0's; and

E. microprocessor algorithms to perform the above.

FIG. 3A shows the RF portion of the receiver which converts the received signal to lower frequencies. FIG. 3B shows a chip code generator with means for shifting a chip code phase for correlation lock, and means for measuring signal strength and the quieting output of the receiver to detect correlation lock over the dynamic range of the system. In FIG. 3A, a first polar diversity antenna 100 and a second polar diversity antenna 102 are shown and are physically turned so that their spatial phase relationship is 90°. Signals received from each of the first and second polar diversity antennas 100, 102 are passed through a 45° phase shifting network 104, 103, respectively, and then to a combiner 105. The combiner 105 combines the signals received from the first and second polar diversity antennas 100, 102. The combined signal then passes through a first bandpass filter 106, is amplified by amplifier 107 and passed through a second bandpass filter 108, and is mixed with the mixer 109. Typically, a crystal 125 controls the frequency of an oscillator 126. The signal from oscillator 126 is frequency multiplied by first, second and third frequency multipliers 128, 129, 130. The signal is mixed at first mixer 109 with the received signal from second bandpass filter 108. The oscillator 126 is modulated by the spread spectrum chip code through a phase shifter 127. The spread spectrum chip code is generated by the circuit in FIG. 3B. First mixer 109 down converts the received signal to a first intermediate frequency signal. The first intermediate frequency signal is in a first intermediate frequency range, and is passed through third bandpass filter 110, amplified by second amplifier 111 and passed through fourth bandpass filter 112. The output signal from bandpass filter 112 is mixed with a second mixer 113 with a second oscillator signal from second oscillator 132 to a second intermediate frequency. The frequency of the second oscillator 132 is controlled by second crystal 131 and frequency multiplied by fourth frequency multiplier 133. The second intermediate frequency signal is then passed through fifth bandpass filter 114, amplified by third amplifier 115, filtered by sixth bandpass filter 116, and amplified by fourth amplifier 117. The second intermediate signal then passes via two routes. The first route passes through seventh bandpass filter 118, fifth amplifier 119 and quadrature detector 121. The quadrature detector 121 is coupled to a 90° phase shift network 120. The output of the quadrature detector 121 is the pre-data. Taps are taken from fourth and fifth amplifiers 117, 119. Signals from these taps pass through signal strength combiner 122, pass through eighth bandpass filter 123

and sixth amplifier 124. The output of sixth amplifier 124 is the signal strength.

Referring to FIG. 3B, an apparatus which is embodied as a microprocessor 147 is shown for synchronizing a spread spectrum chip code using a two step algorithm in a microprocessor coupled to the pre-data output of the receiver. The signal from the pre-data output of the receiver passes through circuitry for generating a quieting output of the receiver.

The signal from circuitry coupled to the pre-data output, for generating the quieting output, includes amplifier 135, ninth bandpass filter 140, signal compressor 141, quadrature detector filter 142 to produce the quieting output from seventh amplifier 143. The output of seventh amplifier 143 is the quieting output, and passes to the microprocessor 147 through analog to digital converter 150. The pre-data signal also passes through a filter comprising fourth and fifth resistors 138, 137 operational amplifier 139 with sixth resistor 158, and first and second capacitors 157, 156. This signal is fed to the microprocessor 147.

The microprocessor 147 further includes means coupled to the correlation means for computing the adaptive average in response to the amplitude of the first data signal not exceeding the preset margin by adding the amplitude of the first data signal to the previously computed adaptive average. The microprocessor 147 comprises means coupled to the quieting output of the receiver via amplifier 143 for correlating the amplitude of a second data signal in response to the amplitude of the first data signal exceeding the preset margin. The second data signal is from the quieting output of the receiver. The first data signal is the digitized amplitude of the first signal, and the second data signal is the digitized amplitude of the second signal. When correlating the second data signal, the microprocessor 147 compares multiple iterations of the spread spectrum chip code, by comparing the second data signal to the adaptive average by a preset margin to determine whether the amplitude of the second data signal exceeds the preset margin.

The microprocessor 147 synchronizes the spread spectrum chip code by comparing the first signal during one information bit to an adaptive average to determine whether coarse correlation has been achieved. In response to the first signal not achieving coarse correlation, the microprocessor 147 computes an adaptive average by adding a first portion of the first data signal to a second portion of the adaptive average. Additionally, the microprocessor 147 correlates a second signal in response to the amplitude of the first signal exceeding the adaptive average by a preset margin to within a portion of one chip of the spread spectrum chip code by comparing the amplitude of the second signal to the adaptive by a preset margin to determine whether the second signal exceeds the preset margin.

The microprocessor 147 also generates a spread spectrum chip code for use with the receiver, which is inputted through phase shifter 127 to oscillator 126 of FIG. 3A. The apparatus, which includes the microprocessor 147 and related circuitry, includes means for entering a spread spectrum chip code having n chips. The entering means may be embodied as hand terminal 153. Also, the apparatus includes memory means for storing chip words, which may be embodied as random access memory 146. The random access memory 146 is coupled to the microprocessor 147. The random access memory 146 stores each chip word having a plurality of bits per

A38

4,977,577

**11**

chip. In a preferred embodiment, there are four bits per chip word. The apparatus further includes counting means coupled to the random access memory 146 for sequencing through n addresses of the chip words in the random access memory 146 and sequentially outputting the chip words to the receiver. The counting means may be embodied as adder 145 and timing circuit 147 with AND gate 159 for determining when to roll over when counting through n chip words. Clock divider 134 is included for controlling the microprocessor 147.

In operation, the RF energy is received by two polar diversity antennas 101 and 102 which are physically rotated 90 degrees, then phase shifted +45 degrees by the first phase shifter 103, and −45 degrees by the second phase shifter 104 and finally summed 105. This polar diversity method enhances faded area reception. The signal is bandwidth limited to 2.0 MHz by a first bandpass filter 106, amplified by first amplifier 107 and bandpass filtered by second bandpass filter 108 before being presented to the first mixer 109.

The first local oscillator generated by a crystal controlled oscillator 126 which is then phase modulated to the equivalent frequency pull of a modulation of 90° at a rate set by the chip code generator.

The chip code is initially selected by either the hand terminal 153 or by the remote serial port 155. Four chip code sets are loaded into the RAM 146 such that a single "1"0 is represented as "1111", this allows sub chip code searches by sequencing the two low order ram address bits. The ram memory is addressed at four times the chip rate so that ¼ chip resolution code searches can be performed. The counter 144 in conjunction with the clock input 156 sets this chip code rate. The binary counter 144 causes the RAM 146 to sequentially select and modulo repeat the entire stored chip code. The AND gate 59 determines the 31st count state ×4 to create a reset pulse and causes the counter to cycle through (31×4) modulo states. In order to rapidly jump to any chip code table position the summer 145 is used to add offset 161 selected by the microprocessor's search algorithm. The flip-flop 160 synchronizes the output of the RAM 146 to the chip code clock 156 to avoid variable propagation delays due to the counters and adders.

Once the chip code has modulated the oscillator 126, the combined signal is multiplied by 128, 129, and 130 to provide a signal from the first local oscillator to frequency mixer 109. This mixing stage 109 provides several features including lowering the frequency to 160 MHz, narrowing the bandwidth to 125 kHz, and when the microprocessor locks the code sequence, the mixer 109 despreads the original transmitted data signal.

The first mixer 109 output is bandpass filtered by third bandpass filter 110, amplified by second amplifier 111 and bandpass filtered by fourth bandpass filter 112. The first intermediate frequency signal is mixed by second mixer 13 with a signal from the second local oscillator. The second local oscillator signal originates from second oscillator 132 and is controlled by crystal 131. The resulting sine wave is frequency multiplied by fourth frequency multiplier 133 before being mixed at second mixer 113. The signal resulting from the second mixer 113 is lowered in frequency to 10.7 MHz and is bandpass filtered by fifth bandpass filter 114, amplified by third amplifier 115 and bandpass filtered by sixth bandpass filter 116. This signal is sent to fourth amplifier 117 with feedback bias current measured along with fifth amplifier 119 by a signal strength measurement

**12**

circuit 122. The signal strength measurement is low pass filtered by first lowpass filter 123 and buffered by sixth amplifier 124 before passing to the signal strength analog multiplexer input 152.

The signal from fourth amplifier 117 is filtered by sixth bandpass filter 118 and amplified by fifth amplifier 119. This output of fifth amplifier 119 is then quadrature detected with the aid of phase shifting circuit 120. The output of the quadrature detector 121 is buffered by amplifier 135, then high pass filtered 140. The signal is compressed to a manageable 45 dB dynamic range by compressor 141. The compressed signal is passed through a quieting detector filter 142 and buffered by amplifier 143 before being inputted to the analog multiplexer input 151.

The "pre-data", buffered by amplifier 135, is also presented to an adaptive data demodulator. Varying DC levels will be present on this signal due to frequency uncertainty between the receiver and transmitters. The data 1/0 decision threshold is chosen as the average voltage of an alternating 1/0/1 . . . pattern in the synch preamble. During the preamble code lock search time, the analog switch 136 is enabled and pre charges capacitor 156 through resistor 137. This places an average voltage on capacitor 156 between a logic "1" and a logic "0". Once code lock is achieved, and the data message synchronization bit 24 is detected, the analog switch 136 is opened leaving the capacitor 156 at a stable level for the duration of the message. The buffered pre-data level is then filtered 157 with hysteresis set by resistors 158 and 138 and compared to the voltage level on capacitor 156. This results in reliable data bits provided on the output of voltage comparator 139.

Code Locking Algorithm

The code locking algorithm seeks to determine a correlation peak by comparing the received RF signal energy to a microprocessor controlled copy of the desired chip code pattern. The code locking algorithm digitizes the quieting detectors analog output once per bit time. The software maintains an adaptive average of the quieting samples to determine the level of correlation improvement. The described algorithm code locks to within ¼ chip time or within 1.25 dB of optimum. The baseband output also can be used in place of the quieting output.

The present invention includes three methods of using a microprocessor for synchronizing the timing acquisition of a spread spectrum chip code received by the receiver. The spread spectrum signal comprises a plurality of information bits. Each information bit is spread in spectrum by a plurality of chips from a spread spectrum code. The first method, as depicted in FIG. 4, comprises the steps performed by the microprocessor of inserting 401 a delay of one information bit time before the first information bit received by the receiver, and sampling and digitizing 402 the first signal from the quieting output of the receiver to generate a first data signal. The sampling and digitizing alternatively can be taken from the baseband or signal strength output of the receiver. The first method compares 404 the amplitude of the first data signal to the adaptive average during the time of one information bit to determine whether coarse correlation has been achieved. In response to coarse correlation not being achieved, the method computes 405 the adaptive average by adding a first portion of the amplitude of the first data signal to a second portion of the previously computed adaptive average. If

4,977,577

13

the coarse correlation has been achieved, then the method shifts 407 the chip code by a third portion of one information bit time. In a preferred embodiment of the present invention, the chip time is divided into four portions, thus the shifts 407 is equivalent to delaying the chip by ¼ chip time duration.

An additional delay is inserted 408 and the method samples and digitizes 409 a second signal from the quieting output of the receiver to generate a second data signal. The amplitude of the second data signal during one information bit time is compared 410 to the adaptive average to determine whether fine correlation has been achieved. If fine correlation has been achieved, then a data capture algorithm is initiated 414. If fine correlation has not been achieved, then the method shifts 412 the chip code phase shifter by a third portion, which is equivalent in the present preferred embodiment to a ¼ time duration of a chip. The method then proceeds to initiate the data capture algorithm.

A delay 401 is inserted before digital conversion of the quieting output 402. This delay serves to insure reoccurring data samples equal to one information bit time. The new sample is compared to the running adaptive average 403. If the improvement is greater than a preset margin, then coarse correlation 404 is achieved. Otherwise, if the new sample is within the noise error of the running average, the new sample is combined with the old average 405; average=(0.25 new +0.75 old average). The chip code phase shifter 161 is incremented by a count of 4 (1 chip time). This coarse code lock algorithm is then indefinitely repeated until coarse code lock is acquired.

If coarse correlation is achieved 404, then the algorithm seeks to "fine" code lock. The chip code phase shifter 161 is shifted 407 by one (¼ chip time). The one information bit time synchronizing delay is passed 408. The quieting detector output is digitized 409 and compared 410 to the running quieting output average. If the new sample did not improve 411 the quieting by the preset margin then the chip code phase shifter is incremented 412 by ¼ chip to its past more optimum position. Fine lock is completed 414 and the code lock algorithm jumps to a data capture algorithm.

If the required margin of quieting improvement is achieved 411, then the number of chip code shifts is checked 413. Any search code position which is shifted more than three ¼ chip steps would undesirably slip one whole code cycle. Comparison 413 stops a search on the third-code slip and assumes an optimum correlation is achieved then proceeds to the data acquisition algorithm 414. If three code phase decrements have not occurred, the algorithm repeats at shift 407.

FIG. 5 shows four cases with one-quarter chip code lock achieved in each case using the first method.

A second method and apparatus for synchronizing a spread spectrum chip code using the baseband signal output of the receiver is shown in FIG. 6. The apparatus aspect of the invention includes means for sampling and digitizing a plurality of analog baseband signals, register means for shifting the plurality of data signals, means for adding in parallel the plurality of data signals, means for comparing the correlation sum and means for dithering a chip/sample clock by a portion of a chip time. The sampling and digitizing means may be embodied as analog to digital converter 201 The register means may be embodied as the plurality of registers 202, 203, 204. The adding means may be embodied as adders 205, 206, 207 and the comparing means may be embodied as com-

14

parator 213. The dithering means may be embodied as the microprocessor 215.

As illustratively shown, the apparatus for synchronizing the spread spectrum chip code has the analog to digital converter 201 coupled to the RF baseband output of the receiver 212. The analog to digital converter 201 samples and digitizes the plurality of analog baseband signals from the baseband output of the receiver 212 and generates a plurality of data signals. The plurality of registers 202, 203, 204 is coupled to the analog to digital converter 201 and shifts the plurality of data signals sequentially through the plurality of registers 202, 203, 204. The plurality of adders 205, 206, 207 are coupled to the plurality of registers 202, 203, 204, respectively, for adding in parallel each of the data signals stored in the plurality of registers 202, 203, 204 according to a plurality of predetermined weights for each of the plurality of data signals, respectively, to generate a correlation sum. The weights are controlled by flip flop circuits 209, 210, 211, which contain the spread spectrum chip code. The adder 207 outputs a correlation sum 208 to a comparator 213 for comparing the correlation sum to a predetermined margin or threshold. The dithering circuit embodies as a microprocessor 215 is coupled to the comparator 213 and dithers the chip clock by at least a first portion of one chip time, thereby improving chip lock.

In operation, the second method of using a microprocessor for synchronizing the timing acquisition of the spread spectrum chip code received by a receiver comprises the steps of sampling and digitizing using the analog to digital converter 201, the plurality of analog baseband signals from the baseband output of the receiver 212, to generate a plurality of data signals. Each of the analog baseband signals is sampled and digitized during one chip time. The method shifts the plurality of baseband signals through the plurality of shift registers 202, 203, 204. The plurality of data signals are added in parallel according to a plurality of predetermined weights, from flip flops 209, 210, 211 for each of the plurality of data signals, respectively, in the plurality of adders 205, 206, 207 to generate a correlation sum 208. The correlation sum 208 is compared to a predetermined threshold or preset margin, and a chip clock is then dithered by at least a first portion of one chip time to improve clock lock. In a preferred embodiment, the first portion is one quarter of one chip time.

The chip clock samples once per chip time. A coarse chip lock may therefore be incorrect by ±½ of a chip. To improve the lock, the chip clock is slewed in ±¼ and/or ±⅛ chip steps controlled by an algorithm in microprocessor 215. A clock with a rate equal to four times the chip rate is counted by counter 214. The counters output is compared to an output of the microprocessor 215 equal to the code phase being searched. The microprocessor 215 can thereby search in fine chip code steps after a rapid parallel assisted search in 1, 31 chip code time. The total search required is equal to 6 chip code times, which can be sent in the spread spectrum transmitters code-lock preamble as disclosed.

As a further component reduction of the circuitry described above in the second species of the method and apparatus for synchronizing a spread spectrum chip code, the parallel assisted chip code lock can be serially summed instead of parallel summed. The serial sum of all 31 stages must be computed between chip samples (less than 1,000 ns). This speed can be achieved with

4,977,577

**15**

available high speed CMOS ASICS with clock speeds of 40 MHz or greater.

A third species of the spread spectrum chip code synchronizing method and apparatus in the present invention, and is set forth in FIG. 7. The third species of the spread spectrum chip code synchronizing apparatus couples to the baseband output of the receiver. The apparatus includes means coupled to the baseband output of the receiver for sampling and digitizing the plurality of analog baseband signals, register means coupled to the sampling and digitizing means for shifting and recirculating the plurality of data signals, and means coupled to the register means for adding sequentially the data signals passing through the shift register means. As shown in FIG. 7, the sampling and digitizing may be embodied as analog to digital converter 310. The register means may be embodied as registers 307, 308, 309 and the adding means may be embodied as adder 303. As shown in FIG. 7, the analog to digital converter 310 is coupled to the baseband output of the receiver, and passes through a plurality of gates 302 to the plurality of registers 307, 308, 309, to adder 303. Also shown is a plurality of flip flops 306, 311, 312 having the spread spectrum chip code therein. The flip flops 306, 311, 312 input the spread spectrum chip code into the adder 303. The adder 330 is coupled to a correlation sum accumulator 304 which outputs a correlation sum 305.

In the preferred embodiment, the third species of the apparatus for synchronizing the spread spectrum chip code has the analog to digital converter 310 coupled to the baseband output of the receiver for sampling and digitizing a plurality of analog baseband signals and generating a plurality of data signals. Each of the analog baseband signals is sampled and digitized during one chip time. The plurality of registers 307, 308, 309 is coupled to the analog to digital converter 310 through gates 302 for shifting and recirculating the plurality of data signals sequentially through the plurality of registers 307, 308, 309 and gates 302. The adder 303 is coupled to register 309 for adding sequentially the data signals passing through registers 309 according to predetermined weights set forth in flip flops 306, 311, 312.

In operation, the third method of uses a microprocessor for synchronizing the timing acquisition of the spread spectrum chip code received by the receiver. The method samples and digitizes the plurality of analog baseband signals from the baseband output of the receiver using analog to digital converter 310, to generate a plurality of data signals. Each of the analog baseband signals is sampled and digitized during one chip time. The method further includes shifting and recirculating the plurality of data signals sequentially through the plurality of registers 307, 308, 309. The data signals are added sequentially as they pass through register 309 using adder 310 and accumulated. The correlation sum accumulator 304 then passes the correlation sum 305 to the microprocessor.

The third method is similar to the second method, except that there is only one adder 303 for the entire register chain instead of one adder per stage. The registers 307, 308, 309 are steered to recirculated by the AND/OR gates 302. The stored chip code string can also be shifted and recirculated. After each chip clock rising stage transition, an analog data sample is converted by analog to digital converter 310 and stored in register 307. Data in the registers are shifted to the right as in the circuit in of FIG. 6. Immediately following the

**16**

chip sample, a sequence is performed to accumulate a correlation sum. The AND/OR steering gates 301 and 302 are switched to the "sum" state. This passes a high speed summing clock of 40 MHz for 31 clock cycles to the registers 307, 305, 309 and to the stored spread spectrum chip code in 306, 311, 312. The steering gates 302 causes data in registers 307, 305, 309 to recirculate so that after 31 clock cycles of the adding phase, the data in registers 307, 308, 309 will be in their original positions and ready to accept another spread spectrum chip code data sample and store phase. After each 40 MHz summing clock transition a new sum is generated by adder 303 and accumulated in accumulator 304. Adder 303 is caused to either add or subtract the inputs Ain from the accumulated total. This is determined by the stored chip code string in flip-flop 312 which creates the x (+1) or x (−1) correlation weighting causing either the addition or subtraction of the Ain inputs. The outputs of accumulator 304 are transferred to the next register stage and then at the next clock rising edge, the accumulator stores that total. After 31 summing clock cycles the accumulation 304 will contain the correlation sum 305. The multibit words stored and summed by the two alternative methods can be reduced to one bit samples and sums, resulting in a small loss of performance.

It will be apparent to those skilled in the art that various modifications can be made to the wireless detection system of the instant invention without departing from the spirit or scope of the invention, and it is intended that the present invention cover modifications and variations of the wireless detection system provided they come within the scope of the appended claims and their equivalents.

We claim:

1. A spread spectrum transmitter comprising:

modulation means having an enable input and a modulation input, for modulating an RF signal with spread spectrum for reducing interference and providing code division multiple access in response to a modulating voltage being applied at the modulation input and an enable signal being applied at the enable input;

an RF power amplifier coupled to said modulating means, and having a keying input;

a bandpass filter coupled to said RF power amplifier;

an antenna coupled to said bandpass filter;

a microprocessor coupled to said modulation means and said RF power amplifier for controlling said modulation means and said RF power amplifier, respectively, said microprocessor including,

chip-code-generation means coupled to the modulation input of said modulation means for storing a spread spectrum chip code, and outputting, during a transmitting interval, the spread spectrum chip code as a modulating voltage to the modulation input of said modulating means;

a preamble register coupled to the modulation input of said modulation means for storing a preamble, and outputting, during the transmitting interval, the preamble as a modulating voltage to the modulation input of said modulation means;

an address register coupled to the modulation input of said said modulation means through said preamble register for storing a device address and a type code, and outputting, during the transmitting interval, the device address and type code as

4,977,577

17

a modulating voltage to the modulation input of said modulation means;

a data register coupled to a data input and to the modulation input of said modulation means through said preamble register and said address register, for storing information data received from the data input, and outputting, during the transmitting interval, the information data as a modulating voltage to the modulation input of said modulation means;

error detection means coupled to said data register for generating error detection data from the preamble, device address and type code and the information data, wherein said error detection means is initialized with a value unique to each installation using said spread spectrum transmitter;

wherein said preamble register, said address register, said data register and said error detection means sequentially output the preamble, device address and type code, error detection data and information data to the modulation input and the spread spectrum chip code from said chip code generating means spreads the preamble, device address and type code, error detection data and information data to generate the spread spectrum of the RF signal, and wherein the preamble provides acquisition for spread spectrum synchronization for demodulating the spread spectrum of the RF signal;

a timing circuit coupled to the enable input of said modulation means and to the keying input of said RF power amplifier for enabling said modulation means and said RF power amplifier, by outputting an enable signal to the enable input of said modulation means and a keying signal to the keying input of said RF power amplifier, respectively, during the transmitting interval; and

a pseudorandom sequence generator coupled to said timing circuit for generating a random number for modifying the timing duration between each transmitting interval.

2. An apparatus coupled to a keying input of an RF power amplifier of a spread spectrum transmitter, for controlling said spread spectrum transmitter, said apparatus comprising:

a modulator having a modulation input, for modulating an RF signal with spread spectrum for reducing interference and providing code division multiple access;

chip-code-generation means coupled to the modulation input of said modulator for storing a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to the modulation input of said modulator;

a preamble register coupled to the modulation input of said modulator for storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulator;

an address register coupled to the modulation input of said modulator for storing the device address, and outputting the device address as a modulating voltage to said modulator;

a data register coupled to a data input and to the modulation input of said modulator for storing information data received from the data input, and outputting the information data as a modulating

18

voltage to the modulation input of said modulator; and

wherein said preamble register, said address register, and said data register sequentially output the preamble, device address, and information data to the modulation input and the spread spectrum chip code from said chip code generating means spreads the preamble, device address, and information data to generate the spread spectrum of the RF signal, an wherein the preamble provides acquisition for spread spectrum synchronization for demodulating the spread spectrum of the RF signal.

3. An apparatus coupled to a modulation input of a modulator of a spread spectrum transmitter, for controlling said spread spectrum transmitter, for communicating with a receiver, said apparatus comprising:

chip code generation means coupled to the modulation input of said modulator for storing a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to said modulator;

a preamble register coupled to the modulation input of said modulator for storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulator;

an address register coupled to the modulation input of said modulator for storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulator;

a data register coupled to a data input and to the modulation input of said modulator for storing information data received from the information data input, and outputting the data as a modulating voltage to the modulation input of said modulator;

a cyclical redundancy check generator coupled to said data register for generating error detection data from the preamble, device address, and the information data;

a timing circuit coupled to said modulator for enabling said modulator during a transmitting interval; and

wherein said preamble register, said address register, said data register, and said cyclical redundancy check generator sequentially output the preamble, device address, and information data and error detection data to the modulation input and the spread spectrum chip code from said chip code generating means spreads the preamble, device address information data and error detection data to generate the spread spectrum of the RF signal, and wherein the preamble provides acquisition for spread spectrum synchronization of the spread spectrum of the RF signal, for demodulating the spread spectrum of the RF signal.

4. The apparatus as set forth in claim 3 further including a pseudorandom sequence generator coupled to said timing circuit for generating a random number for modifying the timing duration between each transmitting interval.

5. An apparatus coupled to modulation means having a modulation input for modulating an RF signal with spread spectrum for reducing interference and providing code division multiple access, for controlling said spread spectrum transmitter, said apparatus comprising:

chip-code-generation means coupled to the modulation input of said modulation means for storing a spread spectrum chip code, and outputting the

4,977,577

**19**

spread spectrum chip code as a modulating voltage to the modulation input of said modulation means;

preamble means coupled to the modulation input of said modulation means for storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulating means;

address means coupled to the modulation input of said modulation means through said preamble means for storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means;

data means coupled to a data input and to the modulation input of said modulation means through said preamble means and said address means, for storing information data received from the data input, and outputting the information data as a modulating voltage to the modulation input of said modulation means;

wherein said preamble means, said address means, and said data means sequentially output the preamble, device address, and information data to the modulation input and the spread spectrum chip code from said chip code generating means spreads the preamble, device address, and information data at the modulation input to generate the spread spectrum of an RF signal, and wherein the preamble provides acquisition for spread spectrum synchronization of the spread spectrum of the RF signal, for demodulating the spread spectrum of the RF signal.

6. The apparatus as set forth in claim 5 further including timing means coupled to the enable input of said oscillator for enabling said oscillator during a transmitting interval.

7. The apparatus as set forth in claim 5 further including pseudorandom sequence means coupled to said timing means for generating a random number for modifying the timing duration between each transmitting interval.

8. The apparatus as set forth in claim 5 further including error-detection means coupled to said data register for generating an error detection algorithm.

9. An apparatus coupled to modulation means having a modulation input for modulating an RF signal with spread spectrum for reducing interference, for controlling said spread spectrum transmitter, said apparatus comprising:

chip-code-generation means coupled to the modulation input of said modulation means for storing a spread spectrum chip code, and outputting the spread spectrum chip code as a modulating voltage to the modulation input of said modulation means;

preamble means coupled to the modulation input of said modulation means for storing a preamble, and outputting the preamble as a modulating voltage to the modulation input of said modulation means;

address means coupled to the modulation input of said modulation means for storing a device address, and outputting the device address as a modulating voltage to the modulation input of said modulation means; and

wherein said preamble means, and said address means, sequentially output the preamble, and device address, to the modulation input and the

**20**

spread spectrum chip code from said chip code generating means spread the preamble, and device address at the modulation input to generate the spread spectrum of an RF signal, and wherein the preamble provides acquisition for spread spectrum synchronization of the spread spectrum of the RF signal, for demodulating the spread spectrum of the RF signal.

10. The apparatus as set forth in claim 9 further including timing means coupled to the enable input of said oscillator and to the keying input of said RF power amplifier for enabling said oscillator and said RF power amplifier, respectively, during a transmitting interval.

11. The apparatus as set forth in claim 9 further including pseudorandom sequence means coupled to said timing means for generating a random number for modifying the timing duration between each transmitting interval.

12. The apparatus as set forth in claim 9 further including error-detection means coupled to said data register for generating an error detection algorithm.

13. A method using processor means for controlling a spread spectrum transmitter having an oscillator with a modulation input and an RF power amplifier with a keying input, comprising the steps, performed by said processor means, of:

storing a spread spectrum chip code in chip code generation means coupled to the modulation input of said oscillator;

outputting, during a transmitting interval, a preamble from a preamble register to the modulation input of said oscillator;

outputting, during a transmitting interval, a device address from an address register coupled to the modulation input of said oscillator;

outputting simultaneously, during the transmitting interval, data from a data register and the spread spectrum chip code stored in said chip code generation means, to the modulation input of said oscillator, thereby generating a spread spectrum signal including the data; and

generating an enabling signal and a keying signal during the transmitting interval, from a timing circuit coupled to the enable input of said oscillator and to the keying input of said RF power amplifier, for activating said oscillator and said RF power amplifier.

14. A method using processor means for controlling a spread spectrum transmitter having an oscillator with a modulation input, comprising the steps, performed by said processor means, of:

outputting, during a transmitting interval, a preamble from a preamble register to the modulation input of said oscillator;

outputting, during a transmitting interval, a device address from an address register coupled to the modulation input of said oscillator; and

outputting simultaneously, during the transmitting interval, data from a data register and a spread spectrum chip code stored in chip code generation means, to the modulation input of said oscillator, thereby generating a spread spectrum signal including the data.

* * * * *

# United States Court of Appeals
## for the Federal Circuit

*NorthPeak Wireless, LLC v. 3COM Corporation,* 2016-1477, -1481

### CERTIFICATE OF SERVICE

I, Christian Hurt, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **March 14, 2016** I electronically filed the foregoing **BRIEF OF THE APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

David Jack Levy
(Principal Counsel)
Thomas R. Davis
Morgan, Lewis & Bockius LLP
1000 Louisiana, Suite 4000
Houston, TX 77002
713-890-5000
dlevy@morganlewis.com
tdavis@morganlewis.com
*Counsel for 3Com Corporation, et al.*

Duncan Palmatier
(Principal Counsel)
Christine H. Yang
Victoria D. Hao
Law Offices of S.J. Christine Yang
17220 Newhope Street
Suites 101 & 102
Fountain Valley, CA 92708
714-641-4022
dpalm@dpalmlaw.com
cyang@sjclawpc.com
vhao@sjclawpc.com
*Counsel for D-Link Systems, Inc.*

Rudolph Kim
(Principal Counsel)
Daniel C. Hubin
Morrison & Foerster LLP
755 Page Mill Road
Palo Alto, CA 94304
650-813-5600
rudykim@mofo.com
dhubin@mofo.com
*Counsel for Fujitsu America, Inc.*

Alfredo A. Bismonte
(Principal Counsel)
Jeremy Duggan
Beck, Ross, Bismonte & Finley LLP
150 Almaden Boulevard, 10th Floor
San Jose, CA 95113
408-938-7900
abismonte@beckllp.com
jduggan@beckllp.com
*Counsel for Asus Computer International Corporation*

Ryan Ken Yagura
(Principal Counsel)
John K. Murray
Vision Winter
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
213-430-6189
ryagura@omm.com
kmurray2@omm.com
vwinter@omm.com
*Counsel for Belkin International, Inc.*

David Spencer Bloch
(Principal Counsel)
David P. Enziminger
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111
415-591-1452
dbloch@winston.com
denzminger@winston.com
*Counsel for U.S. Robotics
Corporation*

Russell W. Faegenburg
(Principal Counsel)
Lerner, David, Littenberg, Krumholz &
Mentlik LLP
600 South Avenue West
Westfield, NJ 07090
908-654-5000
rfaegenburg@lernerdavid.com
*Counsel for Buffalo Technology (USA),
Inc., et al.*

John D. Haynes
(Principal Counsel)
Nicholas Tang Tsui
Alston & Bird LLP
1201 West Peachtree Street
One Atlantic Center
Atlanta, GA 30309
404-881-7000
john.haynes@alston.com
nick.tsui@alston.com
*Counsel for Dell, Inc., et al.*

Ryan R. Smith
(Principal Counsel)
Wilson, Sonsini, Goodrich
& Rosati, PC
650 Page Mill Road
Palo Alto, CA 94304
650-493-9300
rsmith@wsgr.com
*Counsel for Netgear, Inc.*

Ryan W. Koppelman
Alston & Bird LLP
1950 University Avenue
5th Floor
East Palo Alto, CA 94303
650-838-2000
ryan.koppelman@alston.com
*Counsel for Dell, Inc., et al.*

John Joseph Feldhaus
(Principal Counsel)
Pavan K. Agarwal
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, DC 20007
jfeldhaus@foley.com
pagarwal@foley.com
*Counsel for Toshiba America
Information Systems, Inc.*

Jen-Feng Lee
(Principal Counsel)
LT Pacific Law Group LLP
17800 Castleton Street
City Of Industry, CA 91748
626-810-7200
jflee@ltpacificlaw.com
*Counsel for Trendnet Systems, Inc.,
et al.*

Richard C. Vasquez
(Principal Counsel)
Eric W. Benisek
Jeffrey T. Lindgren
Stephen C. Steinberg
Vasquez Benisek & Lindgren, LLP
3685 Mt. Diablo Boulevard, Suite 300
Lafayette, CA 94549
925-627-4250
rvasquez@vbllaw.com
ebenisek@vbllaw.com
mcarthur@vbllaw.com
ssteinberg@vbllaw.com
*Counsel for SMC Networks, Inc.*

Chad S. Campbell
(Principal Counsel)
Dan L. Bagatell
Tyler R. Bowen
Nancy Cheng
Perkins Coie LLP
2901 N Central Avenue, Suite 2000
Phoenix, AZ 85012
602-351-8000
cscampbell@perkinscoie.com
dbagatell@perkinscoie.com
tbowen@perkinscoie.com
ncheng@perkinscoie.com
*Counsel for Intel Corporation*

Dana M. Herberholz
(Principal Counsel)
John N. Zarian
Parsons Behle & Latimer
800 West Main Street, Suite 1300
Boise, ID 83702
208-562-4900
dherberholz@parsonsbehle.com
jzarian@parsonsbehle.com
*Counsel for Viewsonic Corporation, et al.*

William B. Dyer, III
(Principal Counsel)
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
303 Peachtree Street, NE
3500 SunTrust Plaza
Atlanta, GA 30308
404-653-6470
bill.dyer@finnegan.com
*Counsel for Sony Electronics, Inc., et al.*

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

March 14, 2016                                    /s/ Christian Hurt

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 8,488, excluding the parts  of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac in Times New Roman 14 point font.


Date: March 14, 2016


                                                    /s/ Christian Hurt


                                    _____
                                    Christian Hurt
                                    *Attorney for Appellant*